**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **DANIELLE ROGAL-HUDSPETH**<br><br>*Plaintiff*,<br>**v.**<br><br>**CITY OF BOWIE**<br><br>*Defendant*. | CASE NO.: 8:25-cv-02335_ |

**AMENDED COMPLAINT AND JURY DEMAND**

Plaintiff Danielle Rogal-Hudspeth ("Plaintiff"), by and through her undersigned counsel, hereby files suit against Defendant City of Bowie ("Defendant or "City of Bowie" or "the City") and Wendy Wilcox and states as follows:

**THE NATURE OF THE ACTION**

1. This is Plaintiff's civil action against Defendant City of Bowie seeking damages and/or other legal relief for the Defendant's violation of the Fair Employment Practices Act ("FEPA"), Md. Code Ann., State Government § 20-601, *et. seq*., including violations of §§ 20-606 and 20-609 of the FEPA and Prince George's County Code, Subtitle 2, Division 12, Subdivision 1 § 2-186(a)(5), the Americans with Disabilities Act ("ADA)", 42 U.S.C. § 12101, *et seq.,* as amended by the ADA Amendments Act of 2008 ("ADAAA"), the Rehabilitation Act, 29 U.S.C. § 701 *et seq*., and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*

**THE PARTIES**

2. Plaintiff Danielle Rogal-Hudspeth is a citizen of Maryland, residing in Bowie, Maryland.

3. Defendant City of Bowie is a Maryland local government and/or municipality with its principal place of business in Bowie, Maryland. At all times, City of Bowie was acting through its employees, servants, agents, or other affiliates as to the matters alleged herein.

## JURISDICTION, JURY TRIAL, AND VENUE

4. This Court has personal jurisdiction over the Defendant pursuant to Maryland Code, Courts & Judicial Proceedings, § 6-103 because the Defendant transacts business in Maryland and because the cause of action arose in Maryland.

5. Plaintiff has a right to a jury trial of her claims under Maryland law. *See* Maryland Code, State Government, § 20-1013(f).

6. Venue lies with the Circuit Court of Prince George's County pursuant to Maryland Code, Courts & Judicial Proceedings, § 6-201(a), because the Defendant carries on a regular business in Prince George's County, Maryland. Venue also lies in this Court pursuant to Maryland Code, State Government, § 20-1013(b).

## EXHAUSTION OF REMEDIES

7. The Plaintiff has exhausted all of her administrative remedies.

8. The Plaintiff timely filed a charge with the United States Equal Employment Opportunity Commission ("EEOC") on or about June 2, 2023 and an amended charge on or about October 4, 2023. Under Md. Code Ann., State Gov't §§ 20-1013, the filing of a charge with the EEOC allows a claimant to pursue a claim under FEPA. The EEOC/DOJ issued a right to sue letter on April 11, 2024.

9. Plaintiff timely filed suit within 90 days of receiving her right to sue letter.

10. On October 8, 2024, Plaintiff filed a second charge of discrimination with the EEOC regarding her termination.

11. On October 11, 2024, the EEOC issued a right to sue letter specifically related to Plaintiff's termination.

12. On January 8, 2025, the parties entered into a tolling agreement related to the claims raised in the October 8, 2025 charge of discrimination and subsequently amended the tolling agreement to toll the statute of limitations through June 23, 2025.

13. Accordingly, Plaintiff hereby timely files an amended suit to include the additional issues raised in her October 11, 2024 charge of discrimination.

14. Plaintiff has complied with all conditions precedent, administrative requirements, and/or legal preconditions otherwise to properly file and pursue this civil action. This civil action is lawfully filed in this Court. All conditions precedent have occurred or been performed.

## BACKGROUND FACTS

15. In July 2020, Plaintiff began working for the City of Bowie, Maryland's Youth & Family Services Bureau (respectively, the "City" and the "Bureau") as a Family Therapist (Family Counselor I), a position for which she is licensed in the State of Maryland as a Licensed Clinical Marriage and Family Therapist ("LCMFT").

16. Plaintiff holds a Master's Degree in Marriage and Family Therapy (2013), a Bachelor's Degree in Psychology (2006), and a Graduate Certificate in Nonprofit Leadership and Management (2012), all from Arizona State University.

17. Plaintiff earned excellent performance reviews during her first two years of employment, in 2021 and 2022. In the summer of 2022, the City also issued Plaintiff a letter of commendation, accompanied by a monetary bonus, for going above and beyond her call of duty in assisting with a City crisis (a gas explosion at the Bowie Senior Care Facility on June 14, 2022).

18. In addition to her strong performance record, Plaintiff also maintained a highly

positive rapport with her colleagues, including her supervisor, Wendy Wilcox, the Bureau's Youth Services Director (who personally recruited her for the position)—until, as set forth below, Ms. Wilcox began discriminating and retaliating against Plaintiff.

**Wendy Wilcox and the City Discriminated Against Plaintiff After She Sustained a Foot Injury & Retaliated Against Plaintiff After She Requested a Reasonable Accommodation**

19. On Friday, September 30, 2022, Plaintiff broke her right foot (a Jones Fracture on her fifth metatarsal). This (off-work) injury rendered her temporarily disabled.

20. When Plaintiff initially visited the Emergency Room ("ER") for this injury, that same day, she received an X-ray that showed her foot was indeed broken.

21. The ER doctor told her that she could not put any weight on her right foot for a full two weeks, and therefore recommended 100% telework during that time.

22. The following morning, Saturday, October 1, 2022, Plaintiff notified Ms. Wilcox and Nancy D'Imperio, the Bureau's Clinical Supervisor (who reports to Ms. Wilcox), of her injury.

23. Plaintiff also relayed the ER doctor's recommendation that she work 100% remotely for two weeks.

24. By way of context, the City's Family Therapists ("CFT') teleworked for 15 out of the required 37.5 hours of work per week (and had only recently returned to the office on a hybrid schedule after teleworking for the entirety of the pandemic). All of her patient sessions were virtual, via telehealth, at that point. CFT's worked the remaining 22.5 hours per week in the office—including during a 7-hour crisis duty shift (10:00 a.m. to 5:00 p.m. once weekly)[1] and two-night shifts (5:00 p.m. to 9:00 p.m. twice weekly), with the remaining 7.5 hours of in-person work performed at the Family Therapist's discretion.

[1] While on crisis duty, the Family Therapist is responsible for handling new client intakes and any counseling crises or clinical issues that arise.

25. However, for approximately two years during the COVID-19 pandemic, CFT's operated on a fully remote basis and generally conducted all client sessions virtually, as "telehealth sessions."[2]

26. Indeed, through April 2023, the plaintiff continued to conduct all client sessions as telehealth sessions. Only after that a few patient sessions began to be conducted in-person (as an option), and many remained virtual.

27. Plaintiff's request to temporarily be placed on 100% telework status while she recovered from her injury was thus reasonable.[3]

28. On Monday, October 3, 2022, Ms. Wilcox granted Plaintiff's request to be placed on 100% telework status for the two weeks of recovery time that the ER Doctor ordered, with the caveat that, once per week for four weeks total, Plaintiff needed to run an in-person counseling group held on Tuesdays at a local middle school.[4]

29. Because Plaintiff could not drive at that time, Ms. Wilcox asked a new staff member, Amanda Pumphrey, Mentor Program Coordinator, to pick Plaintiff up at her home in her personal vehicle, load her equipment for her, and drive Plaintiff to and from the school.

30. However, Ms. Pumphrey was not available for the first session, on Tuesday, October 4, 2022, so Ms. Wilcox drove Plaintiff to and from the school herself. She remained

[2] The Bureau's Family Therapists had discretion to make limited exceptions to hold in-person sessions, though plaintiff was still seeing all of her patients virtually.

[3] Notably, Ms. Wilcox previously permitted another Family Therapist, Taylor McMahon, to fully telework for approximately three full months while she was recovering from back surgery, in the spring of 2022. Further, from about late 2021 through early 2022, Ms. Wilcox herself fully teleworked from New York for several months, in addition to several other times throughout 2022 and 2023.

[4] The group sessions had not started yet, but were instead scheduled to begin the following day, October 4, 2022, so Ms. D'Imperio recommended that the Bureau cancel or postpone the sessions pending Plaintiff's recovery. But Ms. Wilcox insisted that the sessions proceed as scheduled, and that Plaintiff be the one to run the group, even though several other colleagues were available to run the group in her place (and was common practice to fill in for one another, as Plaintiff has done for her colleagues when needed). In fact, Ms. D'Imperio also initially offered to run the group in lieu of Plaintiff, once Ms. Wilcox refused to cancel or postpone them, but Ms. Wilcox would not allow that, either.

present throughout the session, meaning she could have covered the session herself.[5]

31. The sessions were 45-to-60 minutes long, during which time Plaintiff had to move around on a knee scooter in a heavy compression boot to set up for and assist the group members, which was very painful for Plaintiff, and further exacerbated her injury, since she wasn't able to follow her doctor's orders to keep it iced and elevated.

32. On Thursday, October 6, 2022, Plaintiff met with her podiatrist for the first time since her injury. Her podiatrist concluded that her fracture was more complex than the ER doctor had realized. She directed Plaintiff not to place any weight on her right leg for three months, throughout which time she would evaluate whether Plaintiff's injury would require surgical intervention to heal (which was always an option, due to the extent of the fracture).

33. Plaintiff's podiatrist further ordered her not to drive, to keep her leg iced and elevated, and to use special equipment for any necessary physical movement, which she should limit. That equipment included a knee scooter, a peg leg crutch, an air compression boot, and an ultrasound bone growth stimulator.

34. Plaintiff's podiatrist also directed her to use extensive assistance from family members to perform many major life activities, including moving between locations, switching body positions, and using the bathroom.

35. To facilitate her medical orders, Plaintiff's podiatrist drafted a letter in support of an extended reasonable accommodation (an "RA") for Plaintiff. She recommended that Plaintiff be placed on 100% telework status for a period of three months—the amount of time she anticipated it would take for Plaintiff's bone to fuse back together, assuming surgical intervention

---

[5] A third member of the Bureau's staff, Meagan Bannigan (who was a volunteer at the time, but whom the Bureau has since hired), was also present for the sessions to assist with them.

was not required.

36. On Tuesday, October 11, 2022, Plaintiff's podiatrist's office faxed the RA letter to Ms. Wilcox. Following Ms. Wilcox's receipt of that request, her retaliatory treatment of Plaintiff escalated dramatically, in retaliation for requesting an extension of Plaintiff's telework RA.

37. That same day, Plaintiff ran the second session of the in-person school group, per Ms. Wilcox's orders.

38. Both this session and the first session caused Plaintiff significant pain, during a critical period of her recovery.

39. After the second session, Plaintiff had to be treated in a specialty vein clinic at the hospital for blood clot and Doppler (blood flow) testing on her right leg because she was experiencing circulation issues with her injured foot—likely because, while running the group sessions, she could not keep her right leg iced, elevated, and fully immobile, as her podiatrist had ordered.[6]

40. On Wednesday, October 12, 2022, Ms. Wilcox suggested that, instead of seeking an RA for three months, Plaintiff take Short-Term Disability leave. She did so without engaging in any interactive dialogue about Plaintiff's RA request, which she had received the day prior.

41. Plaintiff replied that she did not want to take Short-Term Disability leave because she was fully capable of performing her job duties with an RA, and because she could not support her family without a full paycheck.[7]

42. Over the next week, Ms. Wilcox continued to refuse to engage in the interactive

[6] On information and belief, Human Resources for the City subsequently intervened and told Ms. Wilcox that Plaintiff should not be running the in-person school groups due to her injury. Plaintiff did not run the remaining two sessions.

[7] As context, Plaintiff is the sole provider for her family of four. Plaintiff has two young children, and her spouse is permanently disabled.

process or grant Plaintiff's RA request, and instead repeatedly criticized the letter from Plaintiff's podiatrist.

43. For example, in an email dated October 17, 2022, Ms. Wilcox claimed that the letter contained "no specific dates" for the "length of disability" and no "orders for a date for a return."

44. However, the note clearly listed the date of Plaintiff's injury as September 30, 2022 and recommended an accommodation for a period of three months, i.e., through December 30, 2022.

45. Further, Ms. Wilcox took issue with the fact that the note stated that telework was "recommended" as opposed to "mandatory" (a trivial matter of semantics), and also stated, "[i]t is perplexing also why the doctor would approve an out-of-town trip, but not any in-person work."[8] She then demanded "a new note ASAP."

46. Plaintiff's podiatrist grew increasingly confused and frustrated by Ms. Wilcox's many requests for changes to the letter, but she complied by drafting and faxing multiple iterations of the letter to Ms. Wilcox.

47. However, Ms. Wilcox repeatedly claimed that she did not receive the faxed letters, for which her podiatrist's office provided fax confirmations.

48. In fact, one of Plaintiff's colleagues told Plaintiff that she saw the letter on top of the fax machine in the Bureau's office, and another colleague told Plaintiff that she had placed a

[8] From October 14-18, 2022, Plaintiff took pre-approved vacation leave to spend a long weekend nearby in Delaware with her family. Throughout her leave, Ms. Wilcox (and at her direction, Ms. D'Imperio) repeatedly contacted Plaintiff (via email, phone, and text message on her personal phone) and accused her of not actually needing a telework RA because she was able to go out of town. Ms. Wilcox's claim was unqualified and unfounded—Plaintiff did not drive to her destination herself, and she required her family's assistance for any necessary physical movement (which she limited) throughout the trip.

copy of the letter in Ms. Wilcox's office mailbox.

49. When Plaintiff returned to work from her trip, on Wednesday, October 19, 2022, Ms. Wilcox told her that she would not grant Plaintiff's RA request, and again suggested that Plaintiff take Short-Term Disability leave.

50. In response, Plaintiff reiterated that she could perform her essential job functions with an RA, and that she could not afford to take Short-Term Disability leave, especially with any of it being unpaid.

51. Plaintiff sought to engage in further discussions about her RA request, with the goal of reaching a workable solution for all parties.

52. Ms. Wilcox replied that she did not have time to discuss Plaintiff's request, but that she would reconsider and follow up with her by email before her shift ended at 3:00 p.m. that day.[9]

53. Ms. Wilcox sent nothing further to Plaintiff until later that night, after 9:00 p.m. In her follow-up email, Ms. Wilcox reiterated that the City was rejecting Plaintiff's RA request, and that the City was instead placing Plaintiff, involuntarily, on Short-Term Disability leave (which would involve an initial 10-day period of unpaid leave, followed by a regular paycheck of only two-thirds of Plaintiff's salary).

54. She also directed Plaintiff not to work her telework shift scheduled for the following day, knowing that Plaintiff would not even see the email until she was scheduled to work the next day.

55. When Plaintiff saw Ms. Wilcox's email after she began work the next morning, October 20, 2022, Plaintiff replied and requested to engage in an interactive dialogue regarding

---

[9] In the meantime, Plaintiff's podiatrist sent Ms. Wilcox yet another iteration of the RA letter (upon her request).

her RA request.

56. Plaintiff explained that "[a] decision for [her] was made entirely without [her]," that Plaintiff did not want to take Short-Term Disability leave, that Plaintiff was "able to work, and need[ed] to maintain [her] income," and that "[She] [hasn't] been given the chance to discuss any options with HR yet."

57. Plaintiff also stated that the forced Short-Term Disability leave "feels punitive."

58. Additionally, Plaintiff noted that, when Ms. Wilcox initially suggested that she take Short-Term Disability leave on October 11, 2022, she told Plaintiff that the City might be able to work with her to avoid the 10 days of unpaid leave, and that she would be provided sufficient notice to plan for any leave time, so that she could notify her clients and transition their files.

59. Contrary to these assurances, she provided Plaintiff with <u>zero</u> notice before forcing Plaintiff onto Short-Term Disability leave beginning immediately.

60. Plaintiff also told Ms. Wilcox that "[m]y doctor would like a standardized form for her to clarify any misconceptions about my injury, instead of editing notes, so she knows exactly what you need for me to be able to work with the reasonable accommodations so my foot can heal properly."

61. At the close of Plaintiff's email, and in an effort to engage in an interactive dialogue, Plaintiff offered to complete the two remaining in-person school groups on Tuesdays, and also offered to cover her colleagues' crisis shifts once her injury healed in exchange for their agreement to cover her 4-5 remaining (in-person) crisis shifts in 2022—which Plaintiff knew they would agree to do, if she asked.

62. In response to her email, Ms. Wilcox stated that she would further discuss the issue with HR and get back to Plaintiff.

63. That same day, October 20, 2022, Plaintiff filed an intake with the U.S. Equal Employment Opportunity Commission ("EEOC") based on the City's discrimination and retaliation against her, including Ms. Wilcox's refusal to engage in an interactive dialogue about her RA request and retaliation against her for requesting an RA.

64. From Friday, October 21 through Monday, October 24, 2022, Plaintiff was off of work to attend a family wedding, for which she had previously sought and obtained leave.

65. Beginning on Friday night, and throughout the weekend, Ms. Wilcox repeatedly contacted Plaintiff via phone, text message, and email, even though she knew that Plaintiff was out with her family—just as she had done during Plaintiff's vacation the weekend prior.

66. In her messages, Ms. Wilcox demanded that Plaintiff attend a meeting with her and Ms. D'Imperio that Monday, October 24, 2022, to discuss her request to engage in a dialogue about her RA request, in lieu of Short-Term Disability leave, even though Plaintiff had never worked for the City on Mondays, as she tended to her own private practice patients' sessions every Monday.

67. Although Plaintiff requested that they meet when she was back in town, during her regular work hours on Tuesday, October 25, 2022,[10] Ms. Wilcox insisted that they meet on Monday.

68. She stated that a meeting on this specific date was a precondition for her reconsideration of her forced Short-Term Disability status.

69. Because Plaintiff had no choice but to attend this compelled meeting on her day off or face continued involuntary Short-Term Disability leave, Plaintiff attended the meeting on

[10] At the time, Plaintiff did not work for the Bureau on Mondays, as her shifts were scheduled Tuesday through Friday.

October 24, 2022.

70. As a result, Plaintiff missed a farewell brunch with her family, left her trip early, and canceled some of her private practice client's sessions.

71. During the meeting, Ms. Wilcox told Plaintiff that she had only two options. First, Plaintiff could remain on Short-Term Disability leave through December 30, 2022, *after* a 10-day elimination period. In other words, 10 days of leave would be deducted from Plaintiff's leave balance, or, if 10 days of leave were not available (as in Plaintiff's case), Plaintiff would be placed on unpaid leave status for 10 days before receiving the reduced (two-thirds) paycheck.

72. Alternatively, Ms. Wilcox told Plaintiff that she could work an additional 7.5 hours of telework per week, but that she needed to work a specific schedule under which Plaintiff was present in the office three days per week, including for crisis shifts on Fridays and two nights shifts on Tuesdays and Thursdays.[11]

73. Ms. Wilcox's requirement that Plaintiff attend work in person three days per week imposed an *even higher burden* on Plaintiff than her non-disabled colleagues, who were permitted to work in person only two days per week.[12]

74. The schedule that Ms. Wilcox mandated was thus insufficient to serve the purpose for which her podiatrist recommended an RA—to limit Plaintiff's physical movements, including travel to/from work.

---

[11] Ms. Wilcox initially told Plaintiff that she could work this schedule through November 4, 2022, after which she needed to submit additional medical documentation of her injury for the City's consideration. After Plaintiff did so, the City extended Plaintiff's RA through December 30, 2022, then later rescinded it altogether.

[12] The other Family Therapists were permitted to work schedules under which their (daytime) crisis shifts aligned with one of their night shifts (meaning that they worked in-person 10:00 a.m. to 9:00 p.m. on those days), and their remaining 7.5 hours of in-office work also aligned with their other night shift, so they could work in the office only twice per week. Although Plaintiff had been working the Friday crisis shift (with the Friday crisis rotation in place, as explained further below) and could not align that shift with a night shift because the Bureau was not open on Friday nights, Ms. Wilcox previously promised Plaintiff that she could change her crisis duty shift if/when Fridays no longer worked for her—such as here, when she required an RA for her injury.

75. Further, as part of this purported RA, Ms. Wilcox revoked other scheduling flexibilities that she afforded to Plaintiff's non-disabled colleagues, and which she had previously afforded Plaintiff, including the customary ability to swap shifts with each other as needed, and to flex their hours to compensate for hours missed, such as for medical appointments or illnesses.

76. Instead, Ms. Wilcox told Plaintiff that she could not have *any* flexibility to shift her assigned in-person hours, including for medical appointments.

77. During their meeting, Ms. Wilcox also told her that, if Plaintiff required assistance to physically move around the office during her crisis shifts, Plaintiff's spouse (who is permanently disabled) and their young children (who were only five- and eight-years-old at the time) should sit in the office conference room while she worked and be on call to assist Plaintiff as needed. Clearly, this was not a workable solution for many reasons.

78. Further, Ms. Wilcox told Plaintiff that she needed to make an immediate decision, before the end of that business day, as to whether to accept her unilateral offer of 7.5 hours of additional telework (which involved an extra day of reporting to the office in person than was required of her non-disabled colleagues), or take Short-Term Disability leave.

79. Faced with no alternative other than forced Short-Term Disability leave, and because Ms. Wilcox refused to further engage in an interactive process to identify alternative, medically sufficient RAs, Plaintiff had no choice but to opt for the additional 7.5 hours of telework under her terms.

80. Later that day, Ms. Wilcox emailed Plaintiff to purportedly recap their conversation and her restricted schedule and threatened that "[a]ny failure to complete the agreed-upon in-person hours without my [Ms. Wilcox's] explicit written permission could nullify this agreement and result in short-term disability status."

81. On or about October 25, 2023, Plaintiff spoke with the City's Human Resources ("HR") Director, Steven Haley, by phone, to report her concerns about Ms. Wilcox discriminating and retaliating against her, unreasonably refusing to grant Plaintiff's RA request or engage in the interactive dialogue process in good faith, attempting to force Plaintiff onto Short-Term Disability leave, and repeated badgering of her while she was out of town with her family.

82. He replied that Ms. Wilcox's behavior was inappropriate and that he would speak to her about maintaining professional boundaries and respecting Plaintiff's personal, non-work time. He also told Plaintiff that he would investigate the matter and assured her that Ms. Wilcox's harassment, discrimination and retaliation would cease, but her harassing, discriminatory and retaliatory behavior only escalated.[13]

83. On November 3, 2022, Plaintiff again spoke with Mr. Haley by phone and further detailed Ms. Wilcox's discrimination and retaliation against her.

84. Plaintiff also forwarded Mr. Haley a number of emails with Ms. Wilcox, as well as a response that Plaintiff drafted to her October 24, 2022 email, which she ultimately did not send due to her fear of retaliation.

85. At Plaintiff's request, on November 9, 2022, Mr. Haley scheduled another phone call with her to further discuss her complaint of discrimination and retaliation.

86. However, to her knowledge, following that call, Mr. Haley did not initiate any investigation into her complaint, or otherwise take corrective action.

87. Instead, he appeared to be sweeping Plaintiff's complaint "under the rug" and

---

[13] Not only did Ms. Wilcox retaliate against Plaintiff for requesting an RA, but she further retaliated against Plaintiff for complaining to HR. As the Bureau's supervisor, she had always pressured the Family Therapists <u>not</u> to go to HR with any issues, and thus she grew angry when Plaintiff sought HR intervention due to her harassing, discriminatory and retaliatory behavior.

protecting Ms. Wilcox, given her high-level managerial role and longer tenure with the City than his.

88. On Friday, December 9, 2022, Plaintiff was on crisis duty, and the only clinician at the office on the day before her planned annual timeshare vacation for her child's birthday.

89. During her shift, Ms. Wilcox contacted Plaintiff and demanded that she attend the City's "Christmas Party," which was being held offsite at the City gymnasium.

90. The Bureau staff's attendance at this party was supposed to be voluntary. Indeed, all the other Family Therapists declined to attend, without any pushback from Ms. Wilcox.

91. As Ms. Wilcox knew, Plaintiff, too, had declined the invitation, for legitimate health reasons.[14]

92. Plaintiff was not comfortable attending given the condition of her foot, because she would need to hop around on her peg leg crutch to navigate through the party carrying food, which would place even further strain on her body.

93. Further, she could not drive herself to the party, as she could not drive at all during that time.

94. In response to Ms. Wilcox's demand, Plaintiff explained to her that she was on crisis duty, that she needed to finish some work before her week off, and that attending the party would be extremely difficult for her, physically.

95. But Ms. Wilcox continued to demand that Plaintiff attend the party anyway.

96. Ms. Wilcox then called Ruth Busch and Lisa Rivera, the Bureau's front office staff, to notify them that Plaintiff would be attending the party, and that Ms. Busch should monitor the Bureau's phone lines in Plaintiff's absence from crisis duty.

[14] Plaintiff also does not celebrate Christmas, as Ms. Wilcox knows.

97. Ms. Wilcox further directed Ms. Busch to drive Plaintiff to the party, in her personal vehicle.

98. Plaintiff thus attended the party, which she attempted to navigate as best she could using her peg leg crutch, which was incredibly painful and humiliating for her.

99. The next week, during her child's birthday party, on Thursday, December 15, 2022, while she was on pre-approved annual leave, Ms. Wilcox engaged in her usual (and retaliatory) practice of repeatedly calling Plaintiff, emailing her, and text messaging her on her personal phone, to demand her immediate attention to routine, non-urgent matters during her off-hours.[15]

100. In her messages, she stated that she was revoking Plaintiff's RA two weeks early because, when she saw Plaintiff at the Christmas Party, she "observed" that she no longer required an RA.

101. She then directed Plaintiff to send her an email with her new work schedule (of only 15 hours of weekly telework, rather than 22.5 hours), to immediately update the Bureau's shared Google calendar with that schedule, and to report to work in person as soon as Plaintiff returned from leave.

102. It appears that Ms. Wilcox forced Plaintiff to attend the Christmas party specifically so that she could "observe" Plaintiff and unilaterally determine—in her non-expert medical opinion—that Plaintiff no longer required an RA and needed to increase her in-office hours.

103. As noted above, Plaintiff was forced to use her peg leg crutch to attend the party, which was extremely painful for her, physically, and which negatively impacted her healing

[15] This was the third occasion on which Ms. Wilcox harassed Plaintiff during a family trip after she requested an RA for her disability. When Plaintiff had previously spoken with Mr. Haley about the issue, he told Plaintiff that her behavior was inappropriate and assured Plaintiff that it would never happen again. He also told Plaintiff that, unless in the event of a client emergency, Plaintiff did not need to respond to Ms. Wilcox during her off-hours.

process.

104. Plaintiff planned to comply with Ms. Wilcox's retaliatory directives, but on the way home from her trip, Plaintiff felt ill and took a positive COVID test.

105. Plaintiff therefore needed to take COVID leave from December 19-30, 2022.[16] Plaintiff's illness also forced her to push off her upcoming appointment with her podiatrist until the first week of January 2023.

106. On January 3, 2023, Plaintiff returned to work with a regular schedule of 15 hours of telework and 22.5 hours of in-person work.

107. The following day, January 4, 2023, Plaintiff emailed Mr. Haley and requested to schedule a call with him regarding Ms. Wilcox's continued harassment, discrimination, and retaliation.

108. Plaintiff explained: "I'm feeling very singled out and harassed because of my disability and requesting the reasonable accommodation for it. It seems to be escalating instead of improving and before it gets any worse, I'd like to address it with you to see what the next steps should be."

109. After Plaintiff's work shift on January 4, 2023, she met with her podiatrist for her rescheduled appointment.

110. Plaintiff's podiatrist told her that the X-ray she received that day showed that her bone had not fused back as it should have, and that her Jones Fracture was now considered a "delayed union" fracture (i.e., that it had only fused about 35% back together after three

[16] When Plaintiff notified Ms. Wilcox of her positive COVID test and sent her a corresponding note from her doctor, Ms. Wilcox falsely accused Plaintiff of "editing" the return-to-work date in the letter (which Plaintiff did not do) and demanded that Plaintiff provide a new letter (which she did).

months).[17]

111. Plaintiff's podiatrist therefore extended her medical recommendation that Plaintiff work 100% remotely, that Plaintiff not place any weight, at all, on her right foot/leg, and that Plaintiff continue to refrain from driving or walking (while surgery to place a pin inside her fractured bone was still an option).

112. She also recommended that she reevaluate her injury at the six-month mark, i.e., on March 30, 2023, to determine whether it was healing sufficiently or if surgical intervention would be required.

113. The next day, January 5, 2023, Mr. Haley responded to her request and scheduled a call with Plaintiff.

114. During the call, Plaintiff told him about the latest recommendations from her podiatrist. Plaintiff also told him that Plaintiff was concerned that Ms. Wilcox's retaliation was escalating upon her return from leave.

115. Later that night, Plaintiff submitted to Mr. Haley and Ms. Wilcox a new note from her podiatrist, which confirmed that she had extended her recommendation for an RA (in the form of 100% telework) to allow her delayed union fracture to heal appropriately.

116. The next day, Friday, January 6, 2023, Ms. Wilcox denied Plaintiff's RA request.

117. Ms. Wilcox also told Plaintiff that the City would not engage in any dialogue about alternative RAs, and thus flatly refused to engage in an interactive process despite the new

[17] Ms. Wilcox's retaliatory denial of Plaintiff's RA request for three months of 100% telework and insistence that Plaintiff continue to report to the office to work in-person three days per week, as well as perform other in-person tasks like facilitating the school-based group, and attending the Christmas Party, presumably had a negative impact on Plaintiff's healing process, as well as the level of pain from her injury.

medical documentation that her podiatrist had submitted.

118. Instead, Ms. Wilcox told Plaintiff that her only options were to either work her regular schedule without any RA, or take Short-Term Disability leave that she already knew was not financially feasible for Plaintiff.

119. Further, she told Plaintiff that Plaintiff needed to make a decision by close of business on Monday, January 9, 2023 (even though Plaintiff doesn't work for the City on Mondays), or otherwise she would take the option of Short-Term Disability leave off the table.

120. Feeling extremely pressured by the City's bad-faith tactics, Plaintiff told Ms. Wilcox that she needed to consult with her podiatrist to get her qualified medical advice before deciding how to best proceed, and that she could not reach her before the mandated deadline for her decision, given her podiatrist's own work schedule so she requested an extension of less than a day, from Monday evening to Tuesday morning so she could speak to her podiatrist when she was back in the office.

121. But Ms. Wilcox forced Plaintiff to make an election anyway, and thus deprived Plaintiff of the ability to seek medical advice about her options.

122. There was no logical business reason as to why Ms. Wilcox could not provide Plaintiff with more time, even just one more day, to decide.

123. Shortly thereafter, Plaintiff sent another email to Mr. Haley in which she stated: "I've been growing more and more concerned with the seemingly punitive nature of emails I'm receiving and the apparent disdain for the disability I'm dealing with. Now I'm being asked to make a decision about short term disability without time to confer with my doctor … and absolutely no interactive dialogue regarding the continuation of the reasonable accommodation that I've had in place." Plaintiff requested to schedule another call with Mr. Haley that day, but

he did not respond to her.

124. Because Ms. Wilcox pressured Plaintiff to make a quick decision, and because Plaintiff knew that her injury needed to heal somehow, she elected to take the Short-Term Disability leave—which placed her family in a very difficult place, financially.

125. As part of that process, Plaintiff applied for and received protected leave under the Family and Medical Leave Act ("FMLA"). Plaintiff went on Short-Term Disability/FMLA leave from January 24, 2023 until April 7, 2023, following the 10-day elimination period from January 9-23, 2023.[18]

126. After Ms. Wilcox again forced Plaintiff onto Short-Term Disability leave, Plaintiff scheduled another call with Mr. Haley, on January 10, 2023.

127. Plaintiff asked him about the next steps with respect to her complaint of disability discrimination and retaliation against Ms. Wilcox, and whether she should seek intervention from the EEOC and/or engage in an internal grievance procedure.[19]

128. In response, he encouraged Plaintiff not to take further action on her complaint, and promised that they would work things out internally.

129. Plaintiff explained that she was deeply concerned that Ms. Wilcox would continue to retaliate against her, including during her next annual performance review, which was forthcoming in the summer of 2023.

[18] While Plaintiff was on Short-Term Disability leave, the City changed its Short-Term Disability leave policy, reducing the 10-day elimination period to a 5-day elimination period. Plaintiff contacted Mr. Haley and requested that the City return 5 days of leave to her paid leave balance (which was exhausted as part of her Short-Term Disability leave) since the policy became effective during her leave. Mr. Haley told Plaintiff that he would consider her request, but ignored all of her follow-up communications concerning the issue, and to this day has still not responded to or reimbursed that week of time.

[19] Plaintiff further noted the latest retaliatory incident against her, in which Ms. Wilcox told her, on January 4, 2023, that moving forward, she could only apply Monday holiday hours to offset her telework hours later in the week, as opposed to her in-person hours on Tuesdays (the next scheduled work hours after the holiday)—which was contrary to their prior arrangement, and the customary practices within the office.

130. In response, Mr. Haley assured Plaintiff that Ms. Wilcox's treatment of her would improve upon her return to work in April, and that she would not be subject to further harassment, discrimination, or retaliation during or after his review.

131. He also told Plaintiff that he would follow up with her upon her return, but did not do so, even after multiple emails and phone calls to him by Plaintiff requesting to follow-up and asking for help in dealing with the continued discrimination and retaliation.

**Ms. Wilcox and the City Discriminated and Retaliated Against Plaintiff Following her Return to Work and After She Submitted Complaints Against Ms. Wilcox**

132. When Plaintiff returned from Short-Term Disability leave on April 11, 2023, she was required to meet with Ms. Wilcox and Ms. D'Imperio prior to beginning any work.

133. During the meeting, Ms. Wilcox claimed that Plaintiff had not sufficiently communicated with the City about her return-to-work date.

134. This claim was false, as Plaintiff had communicated with HR about that date, Ms. Wilcox had her leave dates documented on Plaintiff's approved FMLA application, and emailed Plaintiff multiple times the week before she was scheduled to go back to work, assigning tasks and compelling a response from Plaintiff prior to returning to work, stating that she had received the email that Plaintiff sent to HR confirming Plaintiff's scheduled return to work.

135. Ms. Wilcox also told Plaintiff that the City was altering her work schedule to remove the Friday crisis rotation, meaning that she would bear sole responsibility for the Friday shift each week, without the usual and customary monthly reprieve that was afforded to the clinician that worked that weekly crisis day.

136. Under the previous crisis rotation system (which was established even prior to Plaintiff's hire), Plaintiff's colleagues took turns covering the Friday crisis shift once per month,

and Plaintiff covered all other Friday crisis shifts.

137. The continuation of the Friday crisis rotation was a condition on which Plaintiff agreed to continue working the Friday crisis shifts despite her seniority, as those shifts were the least desirable crisis shifts and were therefore traditionally assigned to the lowest-tenured Family Therapists.

138. In response to this schedule alteration, Plaintiff asked Ms. Wilcox if she could switch her crisis shift from Fridays to a different day, which she had previously promised she could do. [20]

139. She replied that Plaintiff could not do so until the Bureau hired a replacement for Toyosi Alomaja, a Family Therapist who had left her position in February 2023, which had no bearing on the impact of switching crisis days since one weekly shift would still be open.

140. Plaintiff therefore asked if, following that occurrence, she could switch her crisis shift to Tuesdays (occupied by a newly hired therapist, Tamara Hull), or alternatively, Mondays (the shift that Ms. Alomaja had just vacated), if she could move her Tuesday or Thursday night shift to Monday nights so it would be aligned with the crisis shift.

141. In response, Ms. Wilcox flatly denied her request to take over Ms. Alomaja's open Monday crisis days in lieu of Fridays (citing that everybody else had been covering her Friday crisis days while she was out on FMLA) and told her that she needed to keep her Tuesday night shift because at least two-Family Counselors needed to work every night shift, and Taylor McMahon was the only other Family Counselor presently working on Tuesday nights.[21]

142. Failing to follow that logic, Ms. Wilcox also denied her request to move her

[20] At the time that Plaintiff agreed to continue working the Friday crisis shifts, the Bureau had just hired two new Family Therapists, Toyosi Alomaja and Tamara Hull. Ms. Wilcox told her that either Ms. Alomaja or Ms. Hull could take over the Friday crisis shift if and when Plaintiff no longer wanted to work that shift.

[21] In fact, Ms. McMahon would soon be taking maternity leave, which would leave Plaintiff as the *only* Family Therapist working on Tuesday nights, but Ms. Wilcox did not ask any other Family Therapist to join her on Tuesday nights.

Thursday night shift to Monday nights, even though Thursday nights were already sufficiently covered by three Family Therapists, and while Ms. D'Imperio expressed openness to the idea and voiced receptiveness to the switch.

143. On April 19, 2023, Plaintiff sent a follow-up email to Ms. Wilcox in which she recapped their April 11, 2023 meeting. In her email, Plaintiff requested to move her Thursday night shift to Monday nights effective May 15, 2023, as Ms. Wilcox had stated on April 11, 2023 that such a switch could be feasible by that point.

144. Ms. Wilcox responded to her email almost immediately and denied her request. As justification, she claimed that the Bureau was "short-staffed," which did not make sense, because Plaintiff was offering to take over the Monday crisis shift and night shift that Ms. Alomaja had just left vacant.

145. Shortly after she denied Plaintiff's request, on or about April 20, 2023, Ms. Wilcox came into her office to further discuss her schedule.

146. She encouraged her not to respond to her email from April 19, 2023.

147. Instead, she told Plaintiff that she was in the process of working on a solution to the scheduling issue, and that Plaintiff would, indeed, likely be able to change her schedule (from Thursday night and Friday crisis to Monday crisis and night) even before the Bureau hired a replacement for Ms. Alomaja.

148. In response, Plaintiff told her that changing her schedule sooner would benefit her Bureau clients, as Plaintiff would be able to start them off in regular Monday night sessions, rather than moving them from Thursday nights to Monday nights at a later date.

149. On April 25, 2023, Plaintiff emailed Mr. Haley to request a phone call with him that week, as she still feared that Ms. Wilcox would continue to retaliate against her, and because

he had promised that she could follow up on complaints upon her return from Short-Term Disability leave. However, he ignored Plaintiff's email.

150. On May 2, 2023, a security incident occurred in the Bureau office that involved someone who was engaging in unsafe and threatening behaviors toward Plaintiff, other staff, and clients.

151. While managing the incident, Ms. Wilcox did not act in accordance with best practices, specifically endangering the Plaintiff.

152. During that time, Plaintiff was very afraid for her safety, and was directed by Ms. Wilcox to be in someone else's unfamiliar office with access to potential weapons.

153. After the incident (which ultimately involved police intervention), Plaintiff asked Ms. Wilcox to speak with the Bureau staff about safety protocol, so that they could be prepared for any similar incidents in the future.

154. She told Plaintiff that she would raise the issue at the next staff meeting, but never did so.

155. Plaintiff later informed Mr. Haley of the incident by email, which was never addressed.

156. In late April and early May 2023, Ms. Wilcox confirmed that Plaintiff could move forward with switching her schedule from the Friday crisis shift and Thursday night shift to the Monday crisis shift and night shift.

157. She further told Plaintiff, in early May 2023, that she would be instituting a summer system[22] under which the Family Therapists would rotate coverage of the Friday crisis shifts—

[22] This remote crisis duty schedule could not be implemented until after the early June 2023 planned retirement of Ms. Wilcox's superior, Ms. Sally Hein, who upon information and belief, wouldn't authorize such an arrangement.

meaning Plaintiff would still need to work some Friday crisis days, but that Plaintiff would take turns doing so with the other Family Therapists evenly and remotely.

158. Ms. Wilcox told Plaintiff that she wanted to give her advanced notice of this schedule change before she announced it to the rest of the staff, so that she could begin switching session days between the Bureau and private-practice patients.

159. Plaintiff agreed that this schedule change was a workable solution for Plaintiff and thanked her.

160. During the next staff meeting, on May 10, 2023, Ms. Wilcox announced Plaintiff's schedule change, which she stated would become effective the first week of June 2023.

161. She further stated that she would be circulating a sign-up sheet for the summer Friday crisis rotation, which she later distributed the following week.

162. In reliance on Ms. Wilcox's promise that Plaintiff could switch her Thursday night shift to Monday nights, Plaintiff rescheduled all of her private-practice clients from Monday nights to Thursday nights.[23]

163. In turn, Plaintiff rescheduled her then-Bureau clients from Thursday nights to Monday nights, and also scheduled Monday-night appointments with several new Bureau clients whom Ms. D'Imperio assigned to her based on their mutual Monday availability.

164. Indeed, Plaintiff coordinated with Ms. D'Imperio to accept some new Bureau clients who could *only* be seen on Monday nights.

165. Plaintiff also updated the Bureau's shared Google calendar to note her new shifts and client sessions.

---

[23] As the Bureau and Ms. Wilcox knew, Plaintiff ran her own (telehealth) counseling private practice to supplement her income from the Bureau, as Ms. Wilcox, Ms. D'Imperio, and most of the Bureau's other Family Therapists also do.

166. However, on the morning of Tuesday, May 30, 2023, Ms. Wilcox inexplicably revoked her agreement and falsely claimed that the Plaintiff had "NOT been approved to switch evenings."

167. Instead, she stated that, beginning the following week, on June 5, 2023, Plaintiff would be working the Monday crisis shifts, but that Plaintiff's "assigned evenings will continue to be Tuesdays *and Thursdays*." This sudden about-face was clearly retaliatory.

168. Ms. Wilcox well knew Plaintiff had already relied upon her approval of her shift changes to schedule both her Bureau and private-practice clients.[24]

169. In response, Plaintiff emailed Ms. Wilcox to correct her mischaracterization of their prior scheduling discussions.

170. Plaintiff stated: "I moved my entire private practice around to accommodate this switch, which is what you told me to do when you gave me the heads up about it coming down the line before you announced it in a staff meeting. I can't break that into an additional day that I don't have. I'm not sure where this confusion came up today but I thought that the plan was pretty clear and transparent. I certainly don't want to cause any problems. Can we talk about how we might be able to work Mondays out so everything is covered?"[25]

171. Later that day, when Plaintiff arrived at the Bureau for her night shift at 5:00 p.m., Ms. Wilcox immediately stormed into her office, in an aggressive manner, startling her in the dark as she was turning on the lights.[26]

---

[24] Further, Ms. Wilcox's retaliatory requirement that Plaintiff change her schedule *again* would cause her to lose valuable business (three private-practice slots) while commuting to/from the office at least three days per week instead of the two days that the other Family Therapists are permitted to work in the office.

[25] Two other Family Counselors (Marisa Sherman and Symone Colquitt) were *already* working on Thursday nights, so the Bureau had the sufficient coverage required per policy (i.e., two Family Therapists per night shift).

[26] Before Plaintiff arrived, her colleagues observed Ms. Wilcox unlock and enter her office, and then hover and pace around the hallway by her office, preparing to confront Plaintiff.

172. Ms. Wilcox then sat down on Plaintiff's couch and reiterated that she was revoking her prior agreement to allow her to switch her Thursday night shifts to Monday nights—an arrangement to which Ms. Wilcox claimed, falsely, that she had never agreed.

173. Plaintiff tried to discuss the situation with her calmly, to explain that she had already rescheduled both her Bureau and private-practice clients to accommodate this switch (which she had approved), and that it was simply not feasible to move her crisis days without the corresponding switch in night shifts (the reason why Plaintiff requested such a switch to begin with).

174. But Ms. Wilcox refused to engage in a calm dialogue about the issue. Instead, she stood up from the couch, hovered over Plaintiff as she sat at her desk, and, in a loud and intimidating tone of voice, repeated that she would not alter Plaintiff's schedule and demanded that Plaintiff immediately change her schedule and switch all of her affected clients' sessions.

175. Ms. Wilcox then threatened her job, if Plaintiff did not agree to the new schedule, stating "if you want to keep your job, you'll work this schedule."

176. Shortly thereafter, Ms. Wilcox sent Plaintiff another email in which she reiterated that Plaintiff must work the Monday crisis shift and the Tuesday and Thursday night shifts.

177. Following these intimidating and retaliatory interactions with Ms. Wilcox that evening, Plaintiff reached out to Mr. Haley again. Plaintiff's email stated:

> I'm reaching out because I didn't hear back from you yet about this and the situation is now dire. I urgently need to speak with you about feeling harassed and being bullied by my boss, as a result of my disability from the Fall. Prior to me going out on short term disability at the beginning of the year, I spoke to you about being targeted by her and my concerns about retaliatory actions. Those behaviors have only worsened since my return last month and I fear even harsher reprisals as she escalates the situation.
>
> I love my job and working for the city I live in. Can we please speak

> sometime this week to ensure that this situation can be resolved before any more punitive actions are taken against me?

Mr. Haley, once again, ignored Plaintiff's email and failed to investigate or take corrective action.

178. At that time, Ms. Wilcox's retaliatory harassment of Plaintiff was causing her extreme emotional distress, which was detrimental to her health.

179. Although Plaintiff's foot was (finally) healing, she also suffered from Long QT Syndrome—a rare cardiac condition under which her heart's electrical system takes longer than normal to recharge between beats.[27]

180. This condition can cause chest pain, irregular heartbeats, heart palpitations, and coronary spasms, and places Plaintiff at sudden risk of death if she experiences extreme stress.

181. The following day, Wednesday, May 31, 2023, Plaintiff was supposed to meet with Ms. D'Imperio (virtually) for their weekly supervision meeting.

182. When Plaintiff joined the virtual meeting, both Ms. D'Imperio and Ms. Wilcox were on the call. Ms. Wilcox stated that she joined the call to reiterate her mandate that Plaintiff reverse the switch from Thursday nights to Monday nights.

183. Plaintiff, again, tried to reason with her to explain that, in coordination with Ms. D'Imperio, she had already scheduled her Bureau clients for Monday nights (and likewise rescheduled her private-practice clients to Thursday nights).

184. But Ms. Wilcox threatened that, if Plaintiff wanted to keep her job, she needed to comply with her scheduling demands at whatever cost to Plaintiff's clients or Plaintiff.

---

[27] Plaintiff was diagnosed with this condition in October 2022, based on an incidental finding in an electrocardiogram (EKG) test that Plaintiff took when she went to the ER for chest pain. Plaintiff believes that she contemporaneously discussed her cardiac issues with Ms. Wilcox, although she cannot recall whether she told her the name of her condition at that time. As of early May 2023, Plaintiff began wearing a daily cardiac monitor, which was visible to her colleagues and Ms. Wilcox.

185. That day, Plaintiff sent another follow-up email to Mr. Haley, requesting to speak with him either that day or the following day, as well as an email to Ms. Wilcox in an attempt to clear things up.

186. Plaintiff explained to Mr. Haley that "this hostile environment that Wendy has created is very negatively impacting [her] health," and that she was "concerned about further escalations from her and need to know how [she] can proceed."

187. Because Mr. Haley had ignored all Plaintiff's emails since April, Plaintiff followed up by calling him that day, and finally got through to him.

188. During the call, Plaintiff reiterated her concerns about how Ms. Wilcox's retaliatory harassment of her was negatively impacting her cardiac condition (the specific nature of which Plaintiff disclosed to Mr. Haley during the call) and relayed the threatening statements she had made about Plaintiff's job earlier that day.

189. In response, Mr. Haley told Plaintiff that he would (finally) investigate the matter and asked Plaintiff to forward him her recent email correspondence with Ms. Wilcox—which Plaintiff did on June 1, 2023, along with detailed explanations of her concerns.

190. On Thursday, June 1, 2023, while Plaintiff was working, she began hemorrhaging and nearly lost consciousness. Plaintiff was taken to the hospital, where she learned that she had suffered a miscarriage, due to the highly stressful work environment that she had been enduring.[28]

191. After her hospital visit, Plaintiff returned to the office to complete her shift due to her fear of retaliation for missing work, even for valid medical reasons.

192. As was usual and customary (and typically always approved), Plaintiff requested that Ms. Wilcox allow her to make up the hours she had missed earlier that day while she was at

[28] Plaintiff learned that she was pregnant the weekend prior, on May 28, 2023.

the hospital, but Ms. Wilcox denied Plaintiff's request and ignored all follow-ups.

193. Ms. Wilcox told Plaintiff that she instead needed to use her leave time, which she was well-aware was nearly depleted following her return from Short-Term Disability leave and Mr. Haley's refusal to restore five of her elimination days.

194. On Friday, June 2, 2023, the EEOC finalized Plaintiff's Charge of Discrimination and Retaliation against the City, based on the intake she first submitted in October 2022.[29]

195. That same day, Plaintiff sent several emails to Mr. Haley to document her complaint against Ms. Wilcox, and to request a follow-up call. She also told Mr. Haley that she had experienced a medical emergency on Thursday, June 1, 2023, after informing him on Wednesday, May 31, 2023 that Ms. Wilcox's behavior was significantly and negatively impacting her health.

196. Additionally, Plaintiff sent Mr. Haley a detailed summary of the latest retaliation against her, including Ms. Wilcox's disparate treatment of her as compared to her colleagues.

197. Plaintiff also called Mr. Haley's office and left a message, reiterating her request for a call.

198. Plaintiff did not hear anything from Mr. Haley until later that evening, when he sent her a memorandum titled, "Discussion Follow-up," on which he copied Ms. Wilcox, Ms. D'Imperio, Sally Hein, then-Community Services Director (now retired as of July 31, 2023), Nick Spurgeon, then-Community Services Assistant Director (now Acting Community Services Director), and Halcyone Osbourne, HR Generalist.

199. The clearly punitive memorandum stated that, "effective June 5, 2023, and until further notice," Plaintiff must work the Monday crisis shift, the Tuesday and Thursday night shifts,

---

[29] Plaintiff told several of her colleagues about her Charge, after they approached her and told her that they were concerned about Ms. Wilcox's retaliatory treatment of her, which they had observed first-hand.

and the rotating Friday crisis shifts.[30]

200. The memorandum also stated that Plaintiff needed to be in the office on Wednesdays for the weekly staff meeting.

201. The requirement that Plaintiff attend Wednesday staff meetings in person made no sense, because those meetings were held virtually and the Bureau had never before required any Family Therapists to attend them in person.

202. Further, the memorandum stated that Plaintiff needed to be in the office during her Friday crisis rotation shifts, even though, early that same day (June 2, 2023), Ms. Wilcox had circulated an email to the Bureau staff that set forth protocol under which everyone was *supposed to be* permitted to work their Friday crisis shifts virtually over the summer.

203. In other words, the memorandum required Plaintiff to report to the office *five days per week* during her Friday crisis rotation weeks, as compared to the other Family Therapists who only had to report in person two days per week.

204. The memorandum threatened that "[f]ailure to adhere to this schedule may result in severe disciplinary action."

205. Additionally, the memorandum stated that Plaintiff would be "required to have at least 15 client meetings per week."

206. On information and belief, none of the other Family Counselors maintained such a high caseload, nor was it ever necessary for Plaintiff to do so previously.

207. While Plaintiff was close to that caseload number, she did not have control over her caseload, as Ms. Wilcox and Ms. D'Imperio were responsible for assigning her clients to her.

---

[30] As justification, the memorandum contained a number of inaccurate statements, including that Ms. Wilcox had never approved Plaintiff's request to switch her Thursday night shift to Monday nights.

208. Moreover, client cancellations and no-shows (which impact the number of client meetings Plaintiff holds per week) are also out of her control.

209. In response to the memorandum, Plaintiff emailed Mr. Haley later that night.

210. In detail, she explained how the new schedule that Ms. Wilcox mandated was not in accordance with her prior agreement.

211. Plaintiff further detailed her ongoing retaliatory treatment, and described the "hostile work environment" Ms. Wilcox had created, and explained that, "[s]ince my disability, I have been treated differently, unfairly, and have separate expectations than all of my colleagues."

212. Plaintiff noted that the memorandum was another incident of retaliation, and that "[i]t seems like there is no accountability and Wendy's negative actions to quash dissent have become more emboldened as they have been enabled and condoned by the City."

213. Further, Plaintiff stated that she was concerned about the additional retaliation to which Ms. Wilcox would be subjecting her, including during her upcoming annual performance evaluation review.

214. As a result, Plaintiff requested to meet with Mr. Haley the following Tuesday, June 6, 2023, to discuss all of these issues.

215. Plaintiff's colleague, Symone Colquitt, agreed to cover her crisis shift on Monday, June 5, 2023, so that she could attend an appointment with her OBGYN, following her miscarriage.

216. That day, both Ms. Wilcox and Ms. D'Imperio interrogated Ms. Colquitt about why she had swapped crisis shifts with Plaintiff that week—even though they knew Plaintiff had suffered a medical emergency the week prior and had a doctor appointment that day.

217. During that discussion, they told Ms. Colquitt that they had observed her speaking with Plaintiff in the office on Thursday, June 1, 2023, and demanded to know what she had been

speaking about.

218. Ms. Colquitt told them that they should "back off," or words to that effect, because Plaintiff had experienced a miscarriage.[31]

219. That same day, June 5, 2023, Mr. Haley emailed Plaintiff back and told her that his Executive Assistant, Denise Michelle, would contact her to schedule a call, which was ultimately scheduled for 12:00 p.m. on June 6, 2023.

220. During the call, Plaintiff explained to Mr. Haley that the memorandum he sent on Friday contained many inaccuracies, and further explained how Ms. Wilcox was imposing different scheduling standards on her as compared to her colleagues.

221. As Plaintiff spoke, Mr. Haley shifted his position and stated that, contrary to the statements in the memorandum, Plaintiff did not, in fact, need to attend the Wednesday staff meetings in person or complete her Friday crisis rotation shifts in person.

222. Mr. Haley also asked Plaintiff to forward him documentation of the Bureau's standard scheduling practices contradicting Ms. Wilcox's statements, which Plaintiff did later that day, along with a follow-up email recapping their call.

223. During their call, Plaintiff again told Mr. Haley that she was concerned about the likelihood of Ms. Wilcox retaliating against her through her upcoming annual performance review.

224. In response, Mr. Haley told Plaintiff that he did not think Ms. Wilcox would do so and then cut the call short, but told Plaintiff that they could speak again on Thursday, June 8, 2023.

225. However, when Plaintiff tried to schedule that follow-up call, Mr. Haley told

[31] After Ms. Colquitt told Ms. Wilcox and Ms. D'Imperio about Plaintiff's miscarriage, Ms. D'Imperio called another of Plaintiff's colleagues, Marisa Sherman, during her time away from the office, and asked her if she knew about the miscarriage.

Plaintiff that he was not available until the following week.

226. Further, on the afternoon of June 8, 2023, Plaintiff received a meeting invitation for June 13, 2023, titled "Personnel Discussion."

227. The invitees included Mr. Haley, Ms. Wilcox, Ms. D'Imperio, Ms. Hein, Mr. Spurgeon, and Halcyone Osbourne, HR Generalist.

228. Confused, Plaintiff emailed Mr. Haley to ask what the purpose of this meeting was, and whether it was related to her complaints of discrimination and retaliation against Ms. Wilcox.

229. Plaintiff noted that "this situation is greatly affecting my health," and that "I need to meet with HR to share my additional concerns in a safe environment and am not currently comfortable doing so with my management team present since those complaints are about them directly."

230. Later that day, Mr. Haley emailed Plaintiff back and offered to schedule a call for Monday, June 12, 2023, but stated that they needed to keep the June 13, 2023 meeting scheduled in order to "collectively come to a final resolution to the matter."

231. On or shortly before Friday, June 9, 2023, the EEOC officially notified the City of Plaintiff's Charge. After learning of her Charge, the City, again, escalated its retaliation against Plaintiff.

232. That same day—almost immediately after the EEOC notified the City of Plaintiff's Charge—Ms. Wilcox suddenly scheduled Plaintiff's annual performance review meeting for the following Monday, June 12, 2023, before it was expected later in the month and prior to colleagues' evaluations.

233. During the meeting, Ms. Wilcox issued Plaintiff the lowest performance rating that

Plaintiff had ever received during her employment with the City, “Commendable”.[32]

234. In the review, Ms. Wilcox acknowledged that Plaintiff was an “excellent therapist” with “solid” clinical skills and “warm” client relationships, but then claimed—without basis—that Plaintiff was “fail[ing] to meet standards” in the area of “dependability” because of alleged delays in scheduling new clients and completing her timesheets.

235. Plaintiff was not, in fact, delaying new client meetings, which Ms. D’Imperio was responsible for assigning to her, and always submitted her timesheets by the due date, in the same manner that all of her colleagues did.

236. Ms. Wilcox further claimed that Plaintiff required “micro-manage[ment],” of these minor tasks, which was not the case, but was rather an attempt to justify her recent retaliatory micromanagement of Plaintiff.

237. Ms. Wilcox also criticized Plaintiff for allegedly not “communicat[ing] well around issues like scheduling and plans for leave.”

238. Her statements implied that Ms. Wilcox was downgrading Plaintiff’s review for taking (forced) Short-Term Disability/FMLA leave earlier in the year, and other periodic sick leave for her doctor appointments.

239. Plaintiff always communicated about her leave for appointments in the same manner as her colleagues, by noting her appointments on the shared Google calendar, arranging with her colleagues to ensure coverage where needed (as everyone frequently did with each other), noting when she would be working additional hours to make up for any leave taken for appointments, and notifying Ms. Wilcox and/or Ms. D’Imperio.

---

[32] In contrast, Ms. Wilcox issued Plaintiff the highest overall ratings of “Outstanding” for all previous years during those evaluations.

240. Ms. Wilcox refused to rate Plaintiff's "ability to deal with groups," and instead claimed that "Due to Danielle's injury, there were limited opportunities for group work this year."

241. In fact, as noted above, Plaintiff led two in-person school groups on October 4 and October 11, 2022, against her doctor's orders, as was mandated by Ms. Wilcox.

242. Further, as soon as Plaintiff returned from Short-Term Disability leave in April 2023, she led a group for an entire month.

243. Coincidentally, this resulted in a Certificate of Appreciation being subsequently issued to her by the City for her exemplary performance, yet Ms. Wilcox refused to provide a rating in this category, despite Plaintiff's repeated requests to be rated for her performance.

244. Plaintiff's leading of these two separate groups satisfied the established precedent that each Family Therapist lead two groups per year.

245. Ms. Wilcox's refusal to acknowledge her group work on the purported basis that her covered disability resulted in "limited opportunities" for such work was thus discriminatory, and constituted further retaliation against Plaintiff.

246. After the review meeting, Ms. Wilcox reduced both Plaintiff's annual merit increase and cost of living increase to $0, in a further act of retaliation against her.

247. By contrast, as part of her performance review for each of the prior years, Ms. Wilcox issued Plaintiff the highest allowed merit salary increase of 3% of Plaintiff's annual salary, and COLA was between 2-2.5%.

248. During Plaintiff's review meeting, Ms. Wilcox also told Plaintiff that she would be placing Plaintiff on a performance improvement plan (a "PIP"), which she stated was the true purpose of the meeting scheduled for June 13, 2023.

249. Following the review meeting, Plaintiff sent another email to Mr. Haley, in which

she again requested to speak with him and explained the retaliatory and false nature of her review, and that Ms. Wilcox had "effectively taken away her entire merit increase that she knows Plaintiff so desperately relies on."

250. After Plaintiff repeated her request for a call, Mr. Haley finally called Plaintiff later that afternoon.

251. When they spoke, Plaintiff reiterated that her review (as expected, but assured otherwise by Mr. Haley) was the latest act of retaliation by Ms. Wilcox, and that the true purpose of the meeting was to place her on a retaliatory PIP.

252. Plaintiff told Mr. Haley that she feared the PIP and the meeting would be another forum through which Ms. Wilcox would retaliate against her, and that upper management would continue to condone her behavior.

253. Mr. Haley replied that the June 13, 2023 meeting was not scheduled for the purpose of placing Plaintiff on a PIP, but rather, as he had previously assured her, the meeting was meant to "collaboratively resolve her complaints," or words to that effect.

254. He promised that, prior to the meeting, he would send an email to all attendees to explain the meeting's purpose, but he never did. He also told Plaintiff that she could send him a written rebuttal to her performance review, which might result in a higher performance rating and thus negate any purported need for a PIP.

255. On Tuesday morning, June 13, 2023, Mr. Haley's Executive Assistant, Ms. Michelle, notified Plaintiff that the meeting set for later that day would be rescheduled.

256. The meeting was subsequently moved to the following Tuesday, June 20, 2023.

257. Later that afternoon, Plaintiff sent an email to Mr. Haley in which she recapped her call from the prior day and noted that "the more I ask for help, the worse it has become."

258. Plaintiff asked Mr. Haley to, in his capacity as HR Director, finally "complete a thorough investigation" of her complaints. He did not respond.

259. Later that evening, Ms. Wilcox emailed Plaintiff and told her that she and Ms. D'Imperio were scheduling her PIP meeting for the following day, Wednesday, June 14, 2023.

260. Plaintiff forwarded her email to Mr. Haley and requested to speak with him, but he did not respond.

261. Shortly thereafter, while Plaintiff was in her (locked) office for her night shift, Ms. Wilcox used her key to barge into Plaintiff's office unannounced, without calling or knocking first, in an aggressive and intimidating manner.

262. Ms. Wilcox's behavior startled and scared Plaintiff, just as it had on May 30, 2023 (the day before she miscarried), when Ms. Wilcox likewise stormed into Plaintiff's office unannounced while she was emailing Mr. Haley.

263. Ms. Wilcox was well-aware that Plaintiff suffers from a cardiac condition that is aggravated by stress and startle, and it appeared as if she was intentionally placing Plaintiff in these stressful situations.

264. When she stormed in, she demanded to know whether Plaintiff had seen her earlier email about the PIP meeting.

265. Plaintiff confirmed that she had seen the email, and told her that she was working on a rebuttal to her performance review per Mr. Haley's instructions.

266. In response, Ms. Wilcox smirked and told Plaintiff that her review would not change. She then exclaimed in a loud, derisive tone of voice, "so, I'll see you tomorrow!," as she exited Plaintiff's office.

267. Plaintiff subsequently recapped this incident in follow-up emails to Mr. Haley, and

stated that, "I'm extremely shaken from the incident and it's causing me chest pain," for which she needed to consult with her doctor.

268. Plaintiff asked Mr. Haley if they could speak again the following day. Once again, he did not respond to Plaintiff's cries for help.

269. The next day, Wednesday, June 14, 2023, Plaintiff worked for three hours of her six-hour shift,[33] and then notified Ms. Wilcox and Ms. D'Imperio that she had to leave to get checked out by her primary care provider ("PCP") about her increasing chest pain, high blood pressure, and inconsistent, irregular, and elevated heart rate (for which she was wearing a 30-day cardiac monitor).

270. During the appointment, Plaintiff's PCP ordered her to stay home from work until the following week, prescribed additional medication, and directed her to follow up with her cardiologist, with whom Plaintiff scheduled an appointment for the following day, Thursday, June 15, 2023.

271. When Plaintiff met with her cardiologist, he recommended that she take another period of Short-Term Disability leave to avoid the stressful work environment, which was endangering her health due to her cardiac conditions.

272. Although Plaintiff was not scheduled to work on Friday, June 16, 2023, Ms. Wilcox inexplicably docked her vacation leave for that day, which further depleted Plaintiff's leave balance.

273. On Sunday, June 18, 2023, Plaintiff was transported by ambulance to the ER for chest pain and an irregular/increased heart rate (tachycardia). Plaintiff remained in the hospital

[33] To date, the City has not compensated Plaintiff for these hours worked, in violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq*.

through Monday, June 19, 2023.

274. On Tuesday, June 20, 2023, Plaintiff emailed HR to request another period of Short-Term Disability leave. Plaintiff formally applied for the leave on Friday, June 23, 2023, after HR sent her the Short-Term Disability application.

275. In support of Plaintiff's Short-Term Disability application, on Monday, June 26, 2023, she submitted to HR a letter from her cardiologist recommending Short-Term Disability leave for a period of three months, from June 15, 2023 until September 15, 2023.

276. The letter explained that Plaintiff's cardiologist recommended treatment included "staying away from [the] stressful situation at work," as such extreme stress paired with Plaintiff's conditions "place[s] [her] at a higher risk of sudden death."

**The City Refused to Process Plaintiff's Short-Term Disability Application**

277. On June 27, 2023, Ms. Osbourne emailed Plaintiff to confirm the City's receipt of her cardiologist's letter.

278. However, she also wrote, "we also need the City's Short Term Disability request form that was mailed to you."

279. Plaintiff had emailed her request form to Ms. Osbourne on June 23, 2023, on that very same email chain.

280. Plaintiff wrote back to her and noted that she had emailed her the form on Friday, June 23, and asked Ms. Osbourne to confirm receipt.

281. The next day, June 28, Plaintiff followed up and, again, asked Ms. Osbourne to confirm receipt of her form. She never responded to either of her emails.

282. On July 20, 2023, Plaintiff sent another follow-up message to Ms. Osbourne, which stated:

> I'm writing to follow up on the email thread below about the short-term disability request form that I submitted to you on Friday, June 23. I am re-attaching that here, along with the supporting medical documentation from my cardiologist that I submitted to you on Monday, June 26.
>
> Although you previously confirmed receipt of the note from my cardiologist, I have not received the requested confirmation of receipt for my disability request form. Can you please confirm receipt of this email and let me know what the status of my request is?
>
> As you know, my leave balance is depleted, so I have not been receiving salary payments while my request has been pending. I've been out for medical reasons since Wednesday afternoon, June 14, so I've gone several weeks now without any salary. Any information you can provide would be much appreciated.

Ms. Osbourne never responded to Plaintiff. Notably, when Plaintiff applied for Short-Term Disability leave in January 2023, the City processed her application immediately.

283. The City failed to process Plaintiff's Short-Term Disability application (and refused to even respond to her multiple follow-up emails) for nearly three months, until September 18, 2023.[34]

284. Given the City's retaliatory refusal to process Plaintiff's Short-Term Disability application, Plaintiff received no salary for several months during that time, which placed her family in an incredibly difficult situation as they struggled to pay their bills.

285. While Plaintiff was awaiting the City's response to her Short-Term Disability application, Plaintiff noticed that the City posted an opening for a Family Counselor I/II position—the first of which is Plaintiff's position.

286. On July 31, 2023, Plaintiff's legal counsel sent the City a letter of representation in

[34] During that period, the City listed Plaintiff's leave status as "NLNP," or "no leave, no pay," on her paystubs.

which they asserted several legal claims on Plaintiff's behalf, including those encompassed within this Declaration, and explained the City's obligation to preserve all potentially relevant evidence.

287. On August 31, 2023, and in preparation for her planned return to work in September 2023, Plaintiff emailed Mr. Haley (with Ms. Osbourne, Ms. Wilcox, and Ms. D'Imperio copied) to request any paperwork required to request an RA for her cardiac condition.

288. They never responded to Plaintiff.

289. On September 13, 2023, Plaintiff's legal counsel sent the City a "Claim Letter" of notice under the Local Government Tort Claims Act, Md. Code Ann., Cts. & Jud. Proc. §§ 5-301 *et seq.*, to provide formal notice of her legal claims against the City.

290. On September 14, 2023, Plaintiff sent a follow-up email (to her August 31, 2023 email) to Mr. Haley, Ms. Osbourne, Ms. Wilcox, and Ms. D'Imperio, in which she reiterated her request for RA paperwork.

291. Plaintiff also stated: "[A]s you know, and per my cardiologist's recommendation, I applied for Short-Term Disability Leave from June 15th to September 15th, which is tomorrow. My application has remained pending for the duration of that period, despite my multiple requests for an update on the application. Given that the period of my requested leave ends on Friday, I will be returning to work next week."

292. Plaintiff then asked, "if there is anything I should do in preparation for my return."

293. The following day, Friday, September 15, 2023, Mr. Haley finally responded to Plaintiff, with Ms. Osbourne, Ms. Wilcox, and Ms. D'Imperio copied, and stated: "The purpose of this message is both to acknowledge receipt of your email, as well as to inform you that we are **not** prepared for you to return to work this coming Tuesday as you suggested. On Monday, 9/18, you will receive a communique from me, that will include requirements that will need to be

satisfied prior to you returning to work, along with other information."

294. Plaintiff quickly responded to Mr. Haley's email as follows:

> Thank you for your message. So that I am clear, will I be placed on unpaid leave status on Monday, September 18?
>
> Are you able to provide me with the communique you refer to sooner? If there are requirements that I need to meet in order to return to work, I would appreciate your providing them as soon as possible so that I have time to satisfy them before my anticipated return date of Tuesday, September 19.
>
> There is no reason to hold off on sending these until Monday. As you know, I am seeking to return to work as soon as possible and am medically able to do so with reasonable accommodations.
>
> As I noted in my email from Thursday, can you please also provide any necessary paperwork that my doctor may need to complete to support my request for a reasonable accommodation? I reached out about this over two weeks ago, on August 31, but still haven't received a response.

295. Plaintiff heard nothing further from Mr. Haley until Monday, September 18, 2023. On that date, he sent her a letter—via private courier instead of email—on which he copied Ms. Wilcox, Ms. D'Imperio, Mr. Spurgeon, newly promoted Director of Community Services, and Lori Cunningham, newly promoted Acting Assistant Director of Community Services.

296. Mr. Haley's letter stated that the City was "retroactively approv[ing]" Plaintiff's Short-Term Disability application.[35]

297. The letter further stated that Plaintiff would be required to undergo a fitness for duty ("FFD") exam prior to returning to work.

298. The City's requirement that Plaintiff undergo an FFD examination is not consistent with its custom and practice and significantly deviates from its Short-Term Disability policy,

[35] To date, the City has still not provided Plaintiff with her full retroactive Short-Term Disability leave payment.

which states that an employee seeking to return to work must "submit notification from ***their physician*** certifying the employee's fitness to return to work."

299. Indeed, when Plaintiff returned from Short-Term Disability leave in April 2023, the City did not even require a letter from her own physician, much less an FFD examination.

300. Mr. Haley's September 18, 2023 letter stated that, immediately upon Plaintiff's return to work, Plaintiff needed to meet with Ms. Wilcox and Ms. D'Imperio to be placed on a PIP "to address certain performance deficiencies identified in [Plaintiff's] annual performance review for the fiscal year ending June 30, 2023," and emphasized that Plaintiff will need to work whatever schedule that her supervisors assign to her.

301. Mr. Haley's letter, once again, ignored Plaintiff's request to move forward with the RA process, and also ignored Plaintiff's question about her leave status as of Monday, September 18, 2023.

302. On Wednesday, September 20, 2023, Plaintiff sent a follow-up email to Mr. Haley (with Ms. Wilcox, Ms. D'Imperio, Ms. Osbourne, Mr. Spurgeon, and Ms. Cunningham copied) to reiterate her request for RA paperwork and her question as to what leave status the City had placed her on as of Monday, September 18.

303. As of this date, Plaintiff has yet to receive any response to her questions about the RA process.

304. In fact, it appeared that the City was purposefully delaying Plaintiff's return to work so that it could hire someone to replace her before it restored her to her position.

305. Mr. Haley eventually replied that the Admin leave she was forced onto was unpaid.

306. After pushback from Plaintiff invalidating their lack of rationale for not paying her

during this forced leave while she was ready and able to work, the City switched it to Paid Admin Leave and retroactively adjusted the range to arbitrary dates intended specifically to exclude a swath of time.

307. Plaintiff and her legal counsel filed an extensive amended charge of discrimination and retaliation with the EEOC, and cross-filed it with Prince George's County Office of Human Rights and MCCR on or about October 4, 2023.

308. The City was notified of the amended charge's acceptance by the administrative agencies soon thereafter and Ms. Wilcox and the City further retaliated against Plaintiff for engaging in this protected activity.

309. On October 30th, 2023, Plaintiff was notified that she would finally be allowed to return to work, after first meeting with Mr. Haley, Ms. Wilcox, and Ms. D'Imperio at City Hall the next day to be placed on a PIP.

310. The retaliatory PIP was for a period of six months, in clear violation of the City's policies and procedures published in the Employee Handbook stating a 30-day maximum PIP length, and took away all telework privileges for an indefinite period of time surpassing the PIP and required Plaintiff to work ridiculous hours that purposefully interfered with her well-established private practice sessions, during a four- and five-day pre-established work schedule.

311. Additionally, although telework was explicitly barred, Ms. Wilcox demanded that Plaintiff check and respond to her work emails at specific times twice daily on all days off, unlike any of her colleagues.

312. Ms. Wilcox also removed Plaintiff's ability to switch shifts with colleagues and refused to allow her to take time off for religious holidays, as she had always been able to do prior to her disability.

313. When confronted with the facts about this discrepancy, Ms. Wilcox interrupted, spoke over, and refused to allow Mr. Haley to speak.

314. On November 1, 2023, Plaintiff received a cryptic email with a veiled threat from Ms. Wilcox (in her first email to Plaintiff in almost 5 months), referencing the City Manager, Alfred Lott, and stating that Plaintiff's access to email would be suspended shortly. Plaintiff emailed numerous people for clarification, including Ms. Wilcox, Mr. Haley, and the City Manager, but has received no response, still to this day.

315. Following her return to work, Plaintiff was subjected to weekly meetings offsite to discuss her PIP performance with Ms. Wilcox, Mr. Haley, and Ms. D'Imperio who always expressed complete compliance with the PIP's criteria and hadn't voiced any performance complaints or concerns.[36]

316. On Plaintiff's first day back at the office, Monday, November 6, 2023, Ms. Wilcox attempted to nickel and dime Plaintiff's Veteran's Day holiday hours for that week on Friday, November 10, 2023, by sprinkling them across the rest of the week, a few hours here and there each day, to deprive Plaintiff of an actual day off, as she was always afforded prior to her disability, even though Plaintiff had the day off scheduled for the closest day to the holiday that she was scheduled to work, the day before, Thursday, November 9, 2023, and had a medical procedure at her cardiologist's office scheduled for that time off.

317. Ms. Wilcox notified her towards the end of her workday that she was suddenly demanding that Plaintiff modify the week's pre-determined schedule, effective the next morning, by coming in later than scheduled.

---

[36] Although Plaintiff completed and submitted a Mileage Reimbursement Form to both Ms. Wilcox and to Mr. Haley, and requested the reimbursement several times, she has not been reimbursed for any of these required off site meetings and has received no response from either of them about it.

318. Ms. Wilcox refused to allow her the time off at all, even unpaid, or using leave, for her necessary medical procedure, forcing Plaintiff to cancel it, despite Plaintiff's pleas to Mr. Haley to intervene so the holiday time off could be used as is usual and customary, and was planned for it.

319. That day, on November 6, 2023, Plaintiff called Mr. Haley, who agreed that Plaintiff was entitled to a full day off for the holiday, like everybody else receives, and said that he would notify Ms. Wilcox that he authorized Plaintiff to report to work at her agreed upon time the next morning instead of the ludicrous schedule that Ms. Wilcox was demanding.

320. Following that phone call, Ms. Wilcox deliberately attempted to block the hallway leading to the exit door of the YFSB office suite so that Plaintiff could not leave.

321. While blocking Plaintiff's ability to exit the YFSB office suite, Ms. Wilcox was demanding Plaintiff provide confirmation of her compliance to work the retaliatory, piecemeal schedule Ms. Wilcox was insisting upon for that holiday-affected week, beginning the next day.

322. After Plaintiff was able to walk by Ms. Wilcox, she continued to follow the Plaintiff down the YFSB hallway and continued to berate her about confirming her work schedule.

323. Ms. Wilcox has continued aggressively lurking in front of Plaintiff's office, and barging into Plaintiff's office during HR conversations to impose herself, insisting on immediate commitment and agreement to her unreasonable demands, instead of calling or emailing, as is typically professional behavior and the office expectation.

324. Ms. Wilcox ignored Plaintiff's request to vote, and preemptively eliminated her ability to take any religious holidays off as Plaintiff always had prior to her disability.

**The City Terminated Plaintiff for Discriminatory and Retaliatory Reasons**

325. On December 14, 2023, Defendant terminated Plaintiff.

326. Defendant explicitly cited Plaintiff's complaints about Ms. Wilcox's discriminatory and harassing conduct as a reason for her termination.

327. At no time in the termination letter or any other correspondence did Defendant ever suggest that Plaintiff's termination was related to her performance.

328. Defendant failed to follow its own applicable policies and procedures related to terminating employees.

**COUNT I**
(FEPA —Disability Discrimination)

329. The Plaintiff incorporates each of the proceeding paragraphs by reference as if set forth fully herein.

330. The Plaintiff is an "employee" as defined in § 20-601(c)(1). The Defendant is an "employer" as defined in § 20-301(d)(1).

331. Anti-disability discrimination provisions of FEPA are stated at § 20-101, *et seq*. FEPA's prohibition of discrimination on the basis of disability includes a prohibition of discrimination against an individual with a broken foot and who suffers from QT syndrome, because they substantially limit major life activities and/or bodily functions and, with respect to Plaintiff's broken foot, constituted an infirmity that required her reliance on remedial appliances to move about. Md. Code § 20-601(b); P.G. County Code, Subtitle 2, Division 12, Subdivision 1 § 2-186(a)(5).

332. Plaintiff was qualified for her position as a Family Counselor 1 because she could perform her essential job functions with or without reasonable accommodation.

333. The Defendant, it agents and employees have engaged in unlawful discrimination on the basis of disability by taking numerous adverse actions against Plaintiff because of her disabilities—actions to which they have not subjected Plaintiff's non-disabled colleagues,

including but not limited to: (1) repeatedly and unreasonably denied Plaintiff's RA requests for her foot injury and instead (a) unilaterally imposed medically insufficient RAs that involved scheduling requirements and restrictions stricter than those imposed upon her non-disabled colleagues and (b) forced Plaintiff onto Short-Term Disability leave against her will; (2) have refused to engage in an interactive or individualized dialogue concerning Plaintiff's RA request for her cardiac condition; (3) repeatedly and intentionally harassed Plaintiff during off-hours, including while she was on leave with her family; (4) revoked Plaintiff's ability to adjust her schedule as needed, reneged on promises made to Plaintiff about adjusting her schedule, and forced her to work a stricter schedule and caseload than that imposed upon Plaintiff's non-disabled colleagues (including as set forth in the "Discussion Follow-up" memorandum dated June 2, 2023), while continuing to afford Plaintiff's non-disabled colleagues the flexibility to adjust their schedules and caseloads; (5) subjected Plaintiff to intimidating behaviors seemingly designed specifically to trigger her cardiac condition and endanger her health (including when Ms. Wilcox stormed into Plaintiff's office unannounced, twice, on May 30, 2023 and June 13, 2023); (6) downgraded Plaintiff's annual performance review for 2023 and deprived Plaintiff of a merit salary increase or a COLA salary increase, on false and discriminatory bases, including based on her taking of forced Short-Term Disability/FMLA leave and the false claim that her injury resulted in "limited opportunities for group work;"[37] (7) [repeatedly stated their intention to place Plaintiff on a PIP] and placed Plaintiff on a PIP on false and discriminatory bases; (8) refused to process Plaintiff's Short-Term Disability application for approximately *three months*, during which time the City knew that Plaintiff was not receiving a paycheck and struggling, financially; and (9)

[37] This statement constitutes direct evidence of Ms. Wilcox's discrimination against her. *See Fuller v. Phipps*, 67 F.3d 1137, 1142 (4th Cir. 1995).

notified Plaintiff that she must complete an FFD examination prior to returning to work, which is contrary to the City's Short-Term Disability policy, and custom and practice,[38] and which the City delayed to schedule, thus delaying Plaintiff's return to work until October 31, 2023, (10) terminated Plaintiff's employment, and (11) otherwise discriminated against Plaintiff with respect to her compensation, terms, conditions, or privileges of employment because of her disabilities. Md. Code § 20-606(a)(1).

334. The Defendant, its agents and employees also unlawfully limited or classified Plaintiff in a way which deprived her of employment opportunities or otherwise adversely affected her status as an employee because of her disabilities. *See* § 20-606(a)(2).

335. The Defendant treated other non-disabled employees more favorably than Plaintiff, as set forth herein.

336. As a direct and proximate result of the Defendant's wrongful conduct, Plaintiff has suffered substantial pecuniary losses, severe humiliation, mental anguish, and pain and suffering.

337. FEPA § 20-606(a) imposes liability against an employer for taking adverse actions because of the individual's disabilities, and Plaintiff is properly entitled to the requested legal relief based upon Defendant's wrongdoing. Remedies for unlawful disability discrimination under FEPA include injunctive relief; reinstatement; back pay; and compensatory damages. *See* § 20-1009(b)(1); § 20-1013(d).

338. FEPA also authorizes the award of punitive damages and attorneys' fees, litigation costs, and expenses. *See* § 20-2013(e), § 20-1015. By its actions herein, the Defendant has engaged in intentional wrongdoing as would sustain an award of punitive damages under Maryland law.

---

[38] Such deviation from standard procedures is evidence of pretext. *See, e.g.*, *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015).

*See Darcars Motors of Silver Spring, Inc. v. Borzym*, 379 Md. 249, 265-67, 841 A.2d 828, 838 (2004).

**COUNT II**
(FEPA — Retaliation)

339. The Plaintiff incorporates each of the proceeding paragraphs by reference as if set forth fully herein.

340. The Plaintiff is an "employee" as defined in § 20-601(c)(1). The Defendant is an "employer" as defined in § 20-301(d)(1).

341. Anti-disability discrimination provisions of FEPA are stated at § 20-101, *et seq*. FEPA's prohibition of discrimination on the basis of disability includes a prohibition of discrimination against an individual with a broken foot and who suffers from QT syndrome, because they substantially limit major life activities and/or bodily functions and, with respect to Plaintiff's broken foot, constituted an infirmity that required her reliance on remedial appliances to move about. Md. Code § 20-601(b); P.G. County Code, Subtitle 2, Division 12, Subdivision 1 § 2-186(a)(5).

342. An employer may not retaliate against an employee for exercising rights under FEPA. *See* § 20-606 ("An employer may not discriminate or retaliate against any of its employees...because the individual has: (1) opposed any practice prohibited by this subtitle; …."); § 20-609 ("An employer may not interfere with, restrain, or deny the exercise of, or the attempt to exercise, any right provided under this section.").

343. Plaintiff engaged in protected activity on numerous occasions between October 2022 and the present date, by (1) repeatedly requesting RAs and asking Ms. Wilcox and the City to engage in the statutorily required interactive process; (2) reporting and opposing Ms. Wilcox's unreasonable denial of her requested RAs and refusal to engage in the interactive process in good

faith; (3) reporting and opposing Ms. Wilcox's and the City's discrimination against her on the basis of her disabilities; (4) reporting and opposing Ms. Wilcox's and the City's retaliation against her for engaging in protected activity; (5) filing an EEOC Charge (initiated October 20, 2022 and finalized June 2, 2023, then amended on October 4, 2023) on the basis of the discrimination and retaliation to which the City and Ms. Wilcox have subjected her to; and (6) through legal counsel, formally asserting legal claims in correspondence with the City.

344. As a direct result of engaging in these protective activities, Plaintiff suffered materially adverse actions as outlined in [¶128 - ¶320] **¶130 - ¶325**, which include, but are not limited to, being placed on an unfounded PIP (5 months longer than the City's stated maximum range), being refused disability benefits, being placed on mandatory short term disability leave, not being paid for time worked, having leave docked without taking it, not being reimbursed for mileage, being subjected to retaliatory schedule changes, being denied time off for necessary medical procedures, doctor appointments, and religious holidays. Ultimately, the retaliation culminated in Plaintiff's termination.

345. An employer engages in a "materially adverse action" if it takes action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination"—an even lower threshold than that imposed for claims of discrimination. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 54 (2006).

346. As a direct and proximate result of the Defendant's wrongful conduct, Plaintiff has suffered substantial pecuniary losses, severe humiliation, mental anguish, and pain and suffering.

347. Remedies for unlawful retaliation under FEPA include injunctive relief; reinstatement; back pay; and compensatory damages. *See* § 20-1009(b)(1); § 20-1013(d).

348. FEPA also authorizes the award of punitive damages and attorneys' fees, litigation

costs, and expenses. *See* § 20-2013(e), § 20-1015. By its actions herein, the Defendant has engaged in intentional wrongdoing as would sustain an award of punitive damages under Maryland law. *See Darcars Motors of Silver Spring, Inc. v. Borzym*, 379 Md. 249, 265-67, 841 A.2d 828, 838 (2004).

**<u>COUNT III</u>**
(FEPA-Failure to Accommodate)

349. The Plaintiff incorporates the preceding allegations as if set forth fully herein.

350. Plaintiff's broken foot and QT syndrome were severe and disabling and constituted disabilities for the purposes of Md. Code Ann., State Government § 20-601 and § 20-606. Alternatively, the Plaintiff was regarded by the Defendant as having as a physical impairment under State Government § 20-601(b)(1)(iii).

351. Plaintiff was qualified for her position as a Family Counselor 1 because she could perform her essential job functions with or without reasonable accommodation.

352. The Defendants were aware of the Plaintiff's disabilities.

353. The Defendant, its agents, and employees have engaged in unlawful discrimination against Plaintiff by "fail[ing] or refus[ing] to make a reasonable accommodation for the known disability of an otherwise qualified employee."

354. Plaintiff could have performed the essential functions of her position with her requested RA of 100% telework because she would have continued to meet with all clients virtually. Indeed, all of Plaintiff's client sessions were conducted as telehealth sessions through the spring of 2023,[39] and for approximately two years during the COVID-19 pandemic, the

[39] While Plaintiff would not have been present in person for her crisis shifts, she could have covered her colleagues' crisis shifts later in exchange for their covering her crisis shifts while she was out on telework status—as she offered to Ms. Wilcox. Indeed, examples of RAs under the ADA include "modified work schedules." C.F.R. § 1630.2(o)(2)(ii). Plaintiff also could have easily performed her crisis duties remotely, under the same protocol that

Bureau operated on a fully remote basis. Further, in the spring of 2022, Ms. Wilcox permitted another Family Therapist, Ms. McMahon, to fully telework for approximately three full months while she was recovering from back surgery—the *same amount of time* that Plaintiff requested to fully telework for. And, from about late 2021 through early 2022, Ms. Wilcox herself fully teleworked from New York for several months. Plaintiff's request for 100% telework status was thus reasonable.

355. However, Ms. Wilcox and the City refused to grant Plaintiff's RA request, and refused to engage in any meaningful interactive or individualized dialogue to identify alternative options for an RA related to Plaintiff's broken foot, as they were legally required to do under federal, state, and local law.

356. In addition, Ms. Wilcox and the City refused to grant Plaintiff's RA request, and refused to engage in any interactive or individualized dialogue to identify alternative options for a RA related to Plaintiff's QT syndrome, as they were legally required to do under federal, state, and local law.

357. The Defendant's failure and refusal to accommodate constitutes discrimination against the Plaintiff in direct violation of her rights guaranteed by Section 20-606 of the Maryland Civil Rights Act. *See* Md. Code Ann., State Government § 20-606(a)(1) and (2).

358. Plaintiff was discriminated against with respect to the terms and conditions of her employment by the Defendant as a direct result of her disabilities.

359. The Defendants' discriminatory conduct affected tangible aspects of Plaintiff's compensation, terms, conditions, or privileges of employment. Plaintiff was otherwise qualified

---

Ms. Wilcox set forth for all Family Therapists to work their crisis shifts remotely over the summer of 2023 and for two years through the pandemic.

and competent in her employment with the Defendant.

360. As a direct and proximate result of the Defendants' conduct, Plaintiff has suffered substantial pecuniary losses, severe humiliation, mental anguish, and pain and suffering.

**COUNT IV**
(Prince George's County Code—Disability Discrimination)

361. The Plaintiff incorporates each of the proceeding paragraphs by reference as if set forth fully herein.

362. The Defendant is an "employer" as defined in Prince George's County Code § 2-186(a)(5).

363. Prince George's County Code § 2-222 provides that "[n]o employer in the County shall discharge or refuse to hire any person, or act against any person with respect to compensation or other terms and conditions of employment, or limit, segregate, classify, or assign employees because of discrimination."

364. Under § 2-186(a)(3) of the Prince George's County Code, "[d]iscrimination shall mean acting, or failing to act, or unduly delaying any action regarding any person because of… disability…in such a way that such person is adversely affected in the areas of…employment…."

365. The Prince George's County Code's prohibition of discrimination on the basis of disability includes a prohibition of discrimination against an individual with a broken foot and who suffers from QT syndrome, because they substantially limit major life activities and/or bodily functions and, with respect to Plaintiff's broken foot, constituted an infirmity that required her reliance on remedial appliances to move about. Prince George's County Code, Subtitle 2, Division 12, Subdivision 1 § 2-186(a)(18) ("Disability shall mean a physical or mental impairment which substantially limits one or more of a person's major life activities, a record of having such an impairment, or being regarded as having such an impairment.")

366. Plaintiff was qualified for her position as a Family Counselor 1 because she could perform her essential job functions with or without reasonable accommodation.

367. The Defendant, it agents and employees have engaged in unlawful discrimination on the basis of disability by taking numerous adverse actions against Plaintiff because of her disabilities—actions to which they have not subjected Plaintiff's non-disabled colleagues, including but not limited to: (1) repeatedly and unreasonably denied Plaintiff's RA requests for her foot injury and instead (a) unilaterally imposed medically insufficient RAs that involved scheduling requirements and restrictions stricter than those imposed upon her non-disabled colleagues and (b) forced Plaintiff onto Short-Term Disability leave against her will; (2) have refused to engage in an interactive or individualized dialogue concerning Plaintiff's RA request for her cardiac condition; (3) repeatedly and intentionally harassed Plaintiff during off-hours, including while she was on leave with her family; (4) revoked Plaintiff's ability to adjust her schedule as needed, reneged on promises made to Plaintiff about adjusting her schedule, and forced her to work a stricter schedule and caseload than that imposed upon Plaintiff's non-disabled colleagues (including as set forth in the "Discussion Follow-up" memorandum dated June 2, 2023), while continuing to afford Plaintiff's non-disabled colleagues the flexibility to adjust their schedules and caseloads; (5) subjected Plaintiff to intimidating behaviors seemingly designed specifically to trigger her cardiac condition and endanger her health (including when Ms. Wilcox stormed into Plaintiff's office unannounced, twice, on May 30, 2023 and June 13, 2023); (6) downgraded Plaintiff's annual performance review for 2023 and deprived Plaintiff of a merit salary increase or a COLA salary increase, on false and discriminatory bases, including based on her taking of forced Short-Term Disability/FMLA leave and the false claim that her injury resulted in "limited opportunities for group work;" (7) [repeatedly stated their intention to place Plaintiff on

a PIP] and placed Plaintiff on a PIP, on false and discriminatory bases; (8) refused to process Plaintiff's Short-Term Disability application for approximately three months, during which time the City knew that Plaintiff was not receiving a paycheck and struggling, financially; and (9) notified Plaintiff that she must complete an FFD examination prior to returning to work, which is contrary to the City's Short-Term Disability policy, and custom and practice, and which the City delayed to schedule, thus delaying Plaintiff's return to work until October 31, 2023, (10) terminated Plaintiff's employment, and (11) otherwise discriminated against Plaintiff with respect to her compensation and other terms and conditions of employment., because of her disabilities. *See* Prince George's County Code § 2-222.

368. The Defendant, its agents and employees also unlawfully limited or classified or assigned Plaintiff in a way which deprived her of employment opportunities or otherwise adversely affected her status as an employee because of her disabilities. *See* Prince George's County Code § 2-222.

369. The Defendant treated other non-disabled employees more favorably than Plaintiff, as set forth herein.

370. As a direct and proximate result of the Defendant's wrongful conduct, Plaintiff has suffered substantial pecuniary losses, severe humiliation, mental anguish, and pain and suffering.

371. Remedies for unlawful disability discrimination under FEPA include injunctive relief; reinstatement; back pay; and compensatory damages. *See* Prince George's County Code § 2-195, § 2-195.01.

372. Litigation under the Prince George's County Code is authorized pursuant to Md. Code Ann., State Gov't § 20-1202(b).

**COUNT V**

(Prince George's County Code — Retaliation)

373. The Plaintiff incorporates each of the proceeding paragraphs by reference as if set forth fully herein.

374. The Prince George's County Code provides that "[n]o person shall retaliate, or cause or coerce, or attempt to cause or coerce, any other person to retaliate against any person because such person has lawfully opposed any act or failure to act that is a violation of this Act or has, in good faith, filed a complaint, testified, participated, or assisted in any way in any proceeding under this Act."

375. Plaintiff engaged in protected activity on numerous occasions between October 2022 and the present date, by (1) repeatedly requesting RAs and asking Ms. Wilcox and the City to engage in the statutorily required interactive process; (2) reporting and opposing Ms. Wilcox's unreasonable denial of her requested RAs and refusal to engage in the interactive process in good faith; (3) reporting and opposing Ms. Wilcox's and the City's discrimination against her on the basis of her disabilities; (4) reporting and opposing Ms. Wilcox's and the City's retaliation against her for engaging in protected activity; (5) filing an EEOC Charge (initiated October 20, 2022 and finalized June 2, 2023, then amended on October 4, 2023) on the basis of the discrimination and retaliation to which the City and Ms. Wilcox have subjected her to; and (6) through legal counsel, formally asserting legal claims in correspondence with the City.

376. As a direct result of engaging in these protective activities, Plaintiff suffered materially adverse actions as outlined in [¶128 - ¶320] **¶130 - ¶325**, which include, but are not limited to, being placed on an unfounded PIP (5 months longer than the City's stated maximum range), being refused disability benefits, being placed on mandatory short term disability leave, not being paid for time worked, having leave docked without taking it, not being reimbursed for

mileage, being subjected to retaliatory schedule changes, being denied time off for necessary medical procedures, doctor appointments, and religious holidays. Ultimately, the retaliation culminated in Plaintiff's termination.

377. An employer engages in a "materially adverse action" if it takes action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination"—an even lower threshold than that imposed for claims of discrimination. *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 54 (2006).

378. As a direct and proximate result of the Defendant's wrongful conduct, Plaintiff has suffered substantial pecuniary losses, severe humiliation, mental anguish, and pain and suffering.

379. Remedies for unlawful retaliation under the Prince George's County Code include injunctive relief; reinstatement; back pay; and compensatory damages. *See* Prince George's County Code § 2-195, § 2-195.01.

380. Litigation under the Prince George's County Code is authorized pursuant to Md. Code Ann., State Gov't § 20-1202(b).

## COUNT VI
(ADA – Disability Discrimination)

381. The Plaintiff incorporates each of the proceeding paragraphs by reference as if set forth fully herein.

382. At all times material to this Complaint, Plaintiff was an employee of Defendant for the purposes of the ADA pursuant to 42 U.S.C. § 12101 *et seq*.

383. At all times material to this Complaint, Defendant was an employer for the purposes of the ADA pursuant to 42 U.S.C. § 12101 *et seq*.

384. Pursuant to the ADA, it is unlawful to take adverse action against an employee because of their disability.

385. Plaintiff was a qualified individual with a disability because she had a broken/fractured foot and suffers from QT syndrome, which substantially limited major life activities. Plaintiff could perform the essential functions of the position with or without a reasonable accommodation.

386. Defendant subjected Plaintiff to a materially adverse action when it terminated her employment.

387. Defendant's stated reason for its actions directly related to Plaintiff's need for an accommodation.

388. Defendant does not have a legitimate, non-discriminatory reason for this adverse action.

389. Defendant's actions constitute a violation of the ADA.

390. Defendant treated other non-disabled employees more favorably than Plaintiff, as set forth herein.

391. As a direct and proximate result of the Defendant's wrongful conduct, Plaintiff has suffered substantial pecuniary losses, severe humiliation, mental anguish, and pain and suffering.

392. Remedies for unlawful retaliation under the ADA include injunctive relief; reinstatement; back pay; and compensatory damages.

## COUNT VII
(ADA – Retaliation)

393. The Plaintiff incorporates each of the proceeding paragraphs by reference as if set forth fully herein.

394. At all times material to this Complaint, Plaintiff was an employee of Defendant for the purposes of the ADA pursuant to 42 U.S.C. § 12101 *et seq*.

395. At all times material to this Complaint, Defendant was an employer for the purposes of the ADA pursuant to 42 U.S.C. § 12101 *et seq*.

396. Pursuant to the ADA, it is unlawful for an employer to discharge an employee because of that employee's protected activity.

397. Plaintiff engaged in protected activity on numerous occasions between October 2022 and the present date, by (1) repeatedly requesting RAs and asking Ms. Wilcox and the City to engage in the statutorily required interactive process; (2) reporting and opposing Ms. Wilcox's unreasonable denial of her requested RAs and refusal to engage in the interactive process in good faith; (3) reporting and opposing Ms. Wilcox's and the City's discrimination against her on the basis of her disabilities; (4) reporting and opposing Ms. Wilcox's and the City's retaliation against her for engaging in protected activity; (5) filing an EEOC Charge on the basis of the discrimination and retaliation to which the City and Ms. Wilcox have subjected her to; and (6) through legal counsel, formally asserting legal claims in correspondence with the City.

398. As a direct result of engaging in these protected activities, Defendant subjected Plaintiff to a materially adverse action when it terminated her employment.

399. Defendant's stated reason for its actions was because of Plaintiff's protected activity.

400. Defendant does not have a legitimate, non-discriminatory reason for terminating Plaintiff's employment.

401. Defendant's actions constitute a violation of the ADA.

402. As a direct and proximate result of the Defendant's wrongful conduct, Plaintiff has suffered substantial pecuniary losses, severe humiliation, mental anguish, and pain and suffering.

403. Remedies for unlawful retaliation under the ADA include injunctive relief;

reinstatement; back pay; and compensatory damages.

**COUNT VIII**
(Rehabilitation Act – Disability Discrimination)

404. The Plaintiff incorporates each of the proceeding paragraphs by reference as if set forth fully herein.

405. At all times material to this Complaint, Plaintiff was an employee of Defendant for the purposes of the Rehabilitation Act pursuant to 29 U.S.C. § 701 et seq.

406. At all times material to this Complaint, Defendant was an employer for the purposes of the Rehabilitation Act pursuant to 29 U.S.C. § 701 et seq.

407. Pursuant to the Rehabilitation Act, it is unlawful to take adverse action against an employee because of their disability.

408. Plaintiff was a qualified individual with a disability because she had a broken/fractured foot and suffers from QT syndrome, which substantially limited major life activities. Plaintiff could perform the essential functions of the position with or without a reasonable accommodation.

409. Defendant subjected Plaintiff to a materially adverse action when it terminated her employment.

410. Defendant's stated reason for its actions directly related to Plaintiff's need for an accommodation.

411. Defendant does not have a legitimate, non-discriminatory reason for this adverse action.

412. Defendant treated other non-disabled employees more favorably than Plaintiff, as set forth herein.

413. Defendant's actions constitute a violation of the Rehabilitation Act.

414. As a direct and proximate result of the Defendant's wrongful conduct, Plaintiff has suffered substantial pecuniary losses, severe humiliation, mental anguish, and pain and suffering.

415. Remedies for unlawful retaliation under the Rehabilitation Act include injunctive relief; reinstatement; back pay; and compensatory damages.

## **COUNT IX**

(Rehabilitation Act - Retaliation)

416. The Plaintiff incorporates each of the proceeding paragraphs by reference as if set forth fully herein.

417. At all times material to this Complaint, Plaintiff was an employee of Defendant for the purposes of the Rehabilitation Act pursuant to 29 U.S.C. § 701 et seq.

418. At all times material to this Complaint, Defendant was an employer for the purposes of the Rehabilitation Act pursuant to 29 U.S.C. § 701 et seq.

419. Pursuant to the Rehabilitation Act, it is unlawful for an employer to discharge an employee because of that employee's protected activity.

420. Plaintiff engaged in protected activity on numerous occasions between October 2022 and the present date, by (1) repeatedly requesting RAs and asking Ms. Wilcox and the City to engage in the statutorily required interactive process; (2) reporting and opposing Ms. Wilcox's unreasonable denial of her requested RAs and refusal to engage in the interactive process in good faith; (3) reporting and opposing Ms. Wilcox's and the City's discrimination against her on the basis of her disabilities; (4) reporting and opposing Ms. Wilcox's and the City's retaliation against her for engaging in protected activity; (5) filing an EEOC Charge on the basis of the discrimination and retaliation to which the City and Ms. Wilcox have subjected her to; and (6) through legal counsel, formally asserting legal claims in correspondence with the City.

421. As a direct result of engaging in these protected activities, Defendant subjected Plaintiff to a materially adverse action when it terminated her employment.

422. Defendant's stated reason for its actions was because of Plaintiff's protected activity.

423. Defendant does not have a legitimate, non-discriminatory reason for terminating Plaintiff's employment.

424. Defendant's actions constitute a violation of the Rehabilitation Act.

425. As a direct and proximate result of the Defendant's wrongful conduct, Plaintiff has suffered substantial pecuniary losses, severe humiliation, mental anguish, and pain and suffering.

426. Remedies for unlawful retaliation under the Rehabilitation Act include injunctive relief; reinstatement; back pay; and compensatory damages.

## **COUNT X**
(Family and Medical Leave Act – Retaliation)

427. Plaintiff incorporates by reference each of the proceeding paragraphs by reference as if set forth fully herein.

428. At all times relevant, Plaintiff was an employee of Defendant for the purposes of the FMLA, 29 U.S.C. § 2601 et seq.

429. At all times relevant, Defendant was an employer for the purposes of the FMLA, 29 U.S.C. § 2601 *et seq.*

430. Pursuant to the FMLA, it is unlawful for an employer to discharge or otherwise retaliate against an employee who exercises their rights under the Act.

431. Plaintiff took protected FMLA leave from January from January 24, 2023, until April 7, 2023.

432. Following Plaintiff's return from FMLA leave, Defendant treated Plaintiff less

favorably than employees who had not taken protected FMLA leave, subjected her to an intimidating and hostile work environment, and informed Plaintiff that it was placing her on a PIP without any legitimate reason.

433. Ultimately, Defendant subjected Plaintiff to a materially adverse action when it terminated her employment.

434. Defendant does not have legitimate, non-discriminatory reasons for its adverse treatment of Plaintiff, including her termination, following her use of protected FMLA leave.

435. Defendant's actions constitute a violation of the FMLA.

436. Defendant does not have a legitimate, non-discriminatory reason for terminating Plaintiff's employment

437. As a direct and proximate result of the Defendant's wrongful conduct, Plaintiff has suffered substantial pecuniary losses, including backpay.

438. Remedies for unlawful retaliation under the FMLA include injunctive relief; reinstatement; back pay; liquidated damages, and compensatory damages.

WHEREFORE, Plaintiff Danielle Rogal-Hudspeth respectfully prays that this Court grant the following relief:

1. An Order permanently enjoining and restraining Defendant, its agents, officers, servants and employees from discriminating against other employees due to disability;
2. Compensation for compensatory damages, including back pay, front pay, liquidated damages, and/or for punitive damages and costs and reasonable attorneys' fees against the Defendant in an amount in excess of Seventy-Five Thousand Dollars ($75.000.00);
3. Reinstatement; and
4. Any and all additional relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

The Plaintiff requests a trial by jury on all issues raised herein.

Respectfully Submitted,

Cori Cohen

Cori Cohen, Esq.
Gilbert Employment Law, P.C.
8403 Colesville Rd. Ste. 1000
Silver Spring, MD 20910
Tel: (301) 608-0880
Fax: (301) 608-0881
ccohen@gelawyer.com